**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SUDARSHAN NELATURY, | ) | |
| Plaintiff, | ) | C. A. No. 1:21-cv-279 |
| | ) | |
| v. | ) | RE: Motion to Dismiss Amended |
| | ) | Complaint and Motion for Leave to File |
| THE PENNSYLVANIA STATE | ) | Second Amended Complaint (ECF Nos. |
| UNIVERSITY, RALPH FORD, | ) | 10 & 19) |
| Defendants. | | |

**MEMORANDUM OPINION**

Pending before this Court is a Motion to Dismiss the Amended Complaint filed by

Defendants The Pennsylvania State University and Dr. Ralph Ford. ECF No. 10. Also pending is

a Motion for Leave to File Second Amended Complaint by Plaintiff Dr. Sudarshan Nelatury.

ECF No. 19. Each of these Motions will be granted in part and denied in part.

**I.      RELEVANT PROCEDURAL HISTORY**

Dr. Nelatury brings civil rights and breach of contract claims against The Pennsylvania

State University (PSU) and Dr. Ralph Ford, Chancellor and Dean of the college where Dr.

Nelatury teaches. The twenty-eight counts in the complaint can be separated into six categories:

(a) deprivation of free speech rights in violation of the First Amendment of the United States

Constitution and 42 U.S.C § 1983 (Count 1); (b) discrimination on the basis of race, national

origin, age, or sex in violation of Title VII, 42 U.S.C. § 2000e; the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. § 621; Title IX, 20 U.S.C. § 1681; and the Pennsylvania

Human Relations Act (PHRA), 43 P.S. § 951 (Counts 5, 8, 11, 14, 20, 23, 26); (c) retaliation in

violation of the same statutes as the discrimination claims (Counts 6, 9, 12, 15, 21, 24, 27);

(d) hostile work environment in violation of the same statutes as the discrimination and

1

retaliation claims (Counts 7, 10, 13, 16, 22, 25, 28); (e) employment discrimination, retaliation, and hostile work environment in violation of 42 U.S.C § 1981 (Counts 2, 3, 4); and (f) breach of contract in violation of Pennsylvania common law (Counts 17, 18, 19).

Dr. Nelatury brought these claims in his First Amended Complaint. ECF No. 8. The Defendants filed a Motion to Dismiss, Dr. Nelatury filed a brief in opposition, and Defendants filed a reply. ECF Nos. 10, 13, 16. Dr. Nelatury filed a Motion for Leave to File Second Amended Complaint, which Defendants opposed. ECF Nos. 19, 28. Oral argument was held on July 18, 2022. ECF No. 33. The Motions are ripe for disposition by this Court.

## II.      MOTION TO DISMISS STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, the plaintiff must only present factual allegations sufficient to "nudge[]" the claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint should be dismissed pursuant to Rule 12(b)(6) only if it fails to allege enough facts to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While a complaint does not need detailed factual allegations to survive a motion to dismiss, it must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* Nor does the Court accept legal conclusions disguised as factual allegations. *Id.*

Following *Twombly* and *Iqbal*, district courts take a two-step approach to ruling on a motion to dismiss. "First, the factual and legal elements of a claim should be separated." *Fowler*

2

*v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The well-pleaded facts are accepted as true, while the legal conclusions are disregarded. *Id.* at 210–11. "Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.   THE ALLEGATIONS OF THE AMENDED COMPLAINT

Dr. Nelatury is an Associate Professor of electrical and computer engineering at the Behrend College (PSU-Behrend), a branch campus of PSU. ECF No. 8 ¶¶ 15, 18. He is of Indian national origin, male, and over forty years of age. *Id.* ¶¶ 20, 269, 309. His claims arise from the fact that he has not been promoted from Associate Professor to Full Professor.

Dr. Nelatury started teaching at PSU-Behrend in 2003. *Id.* ¶ 22. His primary research areas include electrical engineering, electromagnetics, signal processing, and engineering education. *Id.* ¶ 29. He has authored eight books and thirty-seven peer-reviewed journal papers and has over thirty-eight years of teaching experience. *Id.* ¶¶ 30, 143. Over the past eighteen years, Dr. Nelatury has published more papers in traditional peer-reviewed journals than any other faculty member at PSU-Behrend. *Id.* ¶ 32.

Dr. Nelatury has also co-authored forty-eight papers published in open access journals. *Id.* ¶ 34. Open access journals contain peer-reviewed scholarship that is available free on the internet. *Id.* ¶¶ 113, 120. Compared to traditional publications, open access scholarship eliminates technological and financial barriers, allows knowledge to be disseminated more quickly to a wider audience, and is bound by fewer length restrictions, which permits more detailed descriptions of experiments and results. *Id.* ¶¶ 111–14.

3

Dr. Nelatury applied for promotion to Full Professor during the 2018–19 academic year, but Dr. Ford, the Dean and Chancellor of PSU-Behrend, recommended against Dr. Nelatury's promotion in February 2019. *Id.* ¶¶ 26, 49, 59. Despite the college ad hoc committee recommending that Dr. Nelatury be promoted over a much younger, non-Indian, female faculty member, Dr. Ford recommended that the other faculty member be promoted. *Id.* ¶ 67. Almost a year later, in January 2020, Dr. Nelatury filed a petition with the PSU Senate Committee on Faculty Rights and Responsibilities alleging procedural unfairness because Dr. Ford did not allow him to supplement his dossier of academic work. *Id.* ¶¶ 50, 70, 73. In June 2020, the Committee found in Dr. Nelatury's favor and ruled that Dr. Nelatury would be allowed to supplement his dossier and reapply during the 2020-2021 academic year. *Id.* ¶¶ 75, 77.

Dr. Nelatury filed an administrative charge with the U.S. Equal Employment Opportunity Commission (EEOC) in November 2020 alleging, among other things, discrimination on the basis of race, national origin, and gender. *Id.* ¶ 125.

Dr. Nelatury reapplied and was again recommended for promotion by the college-wide ad hoc committee during the 2020-21 academic year. *Id.* ¶ 128. However, Dr. Ford again did not recommend Dr. Nelatury for promotion. *Id.* ¶ 129. Dr. Ford blocked Dr. Nelatury's progress toward promotion by not forwarding Dr. Nelatury's application to the University Promotion and Tenure Review Committee. *Id.* ¶ 131.

Dr. Ford's evaluations of Dr. Nelatury's scholarship focused on his work in open access publications. *Id.* ¶ 135. Dr. Ford discounted Dr. Nelatury's open access output, implying that any author could be published in open access publications. *Id.* ¶ 159. By not treating open access work the same as traditionally published work, Dr. Ford punished Dr. Nelatury for publishing in open access fora and making his work more available to the public. *Id.* ¶¶ 159, 162. In addition,

Dr. Ford did not recommend Dr. Nelatury for promotion during 2020–21 because Dr. Nelatury had filed an internal grievance and an administrative complaint. *Id.* ¶ 149.

Dr. Ford also ignored Dr. Nelatury's service on university committees and his high scores for student reviews of his teaching effectiveness. *Id.* ¶¶ 55, 97–98. When Dr. Nelatury received lower scores, this was because he was assigned low-level courses that often receive poor scores. *Id.* ¶¶ 99–102, 184. Non-Indian faculty members were not given teaching assignments that lowered their scores. *Id.* ¶¶ 100, 184.

The promotion review process has created stress for Dr. Nelatury. *Id.* ¶ 90. He has been treated for a heart problem and depression. *Id.* ¶ 92. He has not received the salary increase that would have come with promotion. *Id.* ¶¶ 413, 421, 443.

PSU's Policy AC61, which Dr. Nelatury attached to his complaint, is titled "Faculty Contracts." ECF No. 8-4. This policy is not itself a contract, but it "establish[es] the terms and conditions for making standing appointment offers to, and contracting the services of, individuals classified as academic." *Id.* at 1. Policy AC61 provides that faculty contracts "should include . . . [a] statement that provisional appointments and appointments with tenure are subject to the terms and conditions of University tenure policies." *Id.* at 2–3; ECF No. 8 at ¶ 395.

Dr. Nelatury also attached to his complaint Policy AC23, "Promotion and Tenure Procedures and Regulations." ECF No. 8-1. The policy's initial date is July 1, 1952. *Id.* at 1. The version attached to the complaint became effective in 2018, after Dr. Nelatury was hired in 2003. *Id.*; ECF No. 8 ¶ 22. This document provides the procedures for review and promotion and specifies that "decisions to promote should be based on performance and scholarly achievement in the light of the general criteria . . . rather than by time in rank." ECF No. 8-1 at 10; ECF No. 8 at ¶ 407.

5

Finally, Dr. Nelatury attached Policy AC02, "Open Access to Scholarly Articles," which became effective in 2020, ECF No. 8-2; ECF No. 8 at ¶ 116, and "Open Access Policy Recommendations" by the University Faculty Senate Committee on Libraries, Information Systems, and Technology," which is dated 2019, ECF No. 8-3; ECF No. 8 at ¶ 117. These latter two documents are not mentioned in Policy AC61, "Faculty Contracts." *See* ECF No. 8-4.

## IV.    ANALYSIS

### A.  First Amendment Claim

In Count 1, Dr. Nelatury alleges that PSU and Dr. Ford abridged his free speech rights in violation of 42 U.S.C. § 1983. To state a § 1983 claim, he must allege that Defendants (1) acted under color of law, (2) violated his First Amendment rights, and (3) caused him injury. *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011). The specific First Amendment violation Dr. Nelatury alleges is retaliation: that Defendants violated his right to free speech by denying him a promotion because he published articles in open access fora (as opposed to traditional peer-reviewed publications). To state a retaliation claim, "a plaintiff must allege . . . that the activity in question is protected by the First Amendment" and "was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

Both Defendants argue that publishing in open access fora is not expressive conduct entitled to First Amendment protection. They also argue that Dr. Nelatury, as a public employee, must allege that his choice to place his scholarly work in open access publications addressed a matter of public concern. This, they contend, he has failed to do. Finally, Dr. Ford argues that the First Amendment claim against him should be dismissed because he is entitled to qualified immunity. Each of Defendants' three arguments is addressed in turn.

### 1.      Expressive Conduct Constituting Speech

Dr. Nelatury alleges Defendants retaliated against him because he published scholarly work in a particular forum. Defendants argue that the claim should be dismissed because Dr. Nelatury's forum choice is not entitled to First Amendment protection. No controlling case has definitively settled whether an academic's act of choosing a forum in which to publish is protected conduct. Based on principles articulated by the Supreme Court and Third Circuit in "expressive conduct" cases, however, I conclude that Dr. Nelatury's decision to publish in open access fora is protected expressive conduct.

The First Amendment does not shield "an apparently limitless variety of conduct" by which a person "intends . . . to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Conduct is protected if "the nature of the activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002) (internal quotation marks, citation, and alteration omitted). Protected expressive conduct includes activities like flag-burning, flag-displaying, and armband-wearing. *Id.* at 159 (collecting cases).[1]

Conduct is expressive if the actor "inten[ded] to convey a particularized message" and "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation omitted). Accepting the allegations in the complaint as true, Dr. Nelatury's choice to publish in open access fora is expressive. He alleges

---

[1] *Sorrell v. IMS Health Inc.*, which Dr. Nelatury cites, is inapplicable because it involved literal "speech." 564 U.S. 552, 570 (2011). Determining whether the First Amendment protects drug manufacturers' "creation and dissemination of information" about doctors' prescribing habits, *id.*, is different from determining whether conduct (here, the choice of a publication forum) is expressive and therefore protected.

his intent to convey a message: his "motive[] in publishing through open access fora was to make his scholarship available more widely to the general public." ECF No. 8 ¶ 158. Further, his allegations make it plausible his audience would likely understand his choice of forum to convey that message. PSU, among other universities, has endorsed the use of open access publication to increase access to academic scholarship. *Id.* ¶¶ 115–18. PSU has stated that adopting an open access policy furthers "its mission of teaching, research, and public service." *Id.* ¶ 116.

This case is distinguishable from those cited by Defendants. In one case, a panel of the Third Circuit rejected a teacher's claim that scheduling therapy sessions for a student, transporting the student to the sessions, and attending them with the student was "expressive." *Montanye v. Wissahickon Sch. Dist.*, 218 F. App'x 126, 129–31 (3d Cir. 2007). But Dr. Nelatury's choice of open access publication in the context of an alleged movement in favor of expanding access to academic scholarship has more communicative weight than Montanye's extracurricular assistance of a disabled student. In a published opinion, a prison employee challenged a regulation mandating display of the American flag on his uniform sleeve. *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1088 (3d Cir. 1995). Unlike Troster's "bare assertion" that "passively wearing the flag patch" was expressive, *id.* at 1091, Dr. Nelatury's allegations about motive and context show his conduct was plausibly "demonstrative of an attitude or belief," *id.* at 1091, 1092 n.4.

These allegations also distinguish this case from *Tenafly*. There, Orthodox Jewish individuals challenged an ordinance that prevented them from attaching *lechis* (thin black strips of plastic) to utility poles. 309 F.3d at 154. The *lechis* designated areas in which the Jewish residents could permissibly push or carry objects on the Sabbath. *Id.* at 151–52. The *lechis* were not expressive because they served a "purely functional, non-communicative purpose

indistinguishable, for free speech purposes, from that of a fence surrounding a yard." *Id.* at 162. Dr. Nelatury's choice of open access publication, in the context of a movement to make scholarship more publicly available, is imbued with elements of communication that the *lechis* were not. Thus, Dr. Nelatury pleads sufficient facts that his act of publishing in open access fora was "expressive conduct" protected by the First Amendment.

### 2. Public Employee

Dr. Nelatury works at PSU, so he is a public employee, and "[n]ot all First Amendment activity is constitutionally protected in the public workplace. 'When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.'" *Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). A public employee bringing a First Amendment claim must demonstrate that he (1) "spoke as a citizen," not "pursuant to [his] official duties," (2) on "a matter of public concern," and (3) the employer "did not have an adequate justification for treating the employee differently from any other member of the general public." *Id.* (internal quotation marks and citations omitted). Defendants challenge only the second prong: whether Dr. Nelatury spoke on a matter of public concern.[2]

---

[2] As Defendants acknowledge, it remains an open question before both the Third Circuit and the Supreme Court whether *Garcetti*—which added prong one, the pursuant-to-official-duties analysis, to the test for First Amendment retaliation against public employees—"would apply in the same manner to a case involving speech related to scholarship or teaching." *Gorum v. Sessoms*, 561 F.3d 179, 186 (3d Cir. 2009) (quoting *Garcetti*, 547 U.S. at 425). Numerous Circuits have expressly declined to apply *Garcetti* in such cases. *See, e.g.*, *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011). Defendants say that "Dr. Ford could reasonably have believed that Plaintiff's decision to publish in open access journals was not protected, because publishing research in journals was part of Plaintiff's official duties." ECF No. 11 at 9 n.2. But they stop short of arguing that Dr. Nelatury was required and failed to allege that he was speaking as a citizen. Therefore, this Court will not dismiss the claim based on the "official duty" prong.

Dr. Nelatury alleges that "[a]cademic freedom" and his engineering "academic work" are of interest to the general public. ECF No. 8 ¶¶ 163–64. The latter is irrelevant because, as Defendants note, Dr. Nelatury alleges his conduct of publishing, not the content of his research, triggered the First Amendment violation. In any event, the alleged message expressed by Dr. Nelatury's conduct easily fits the bill for being a matter of public concern. Widespread access to academic scholarship (or lack thereof) is "a social or political concern of the community" relating to "broad social or policy issues." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 170 (3d Cir. 2008) (citation omitted) (collecting cases). And Dr. Nelatury's speech on the matter extended into a public forum. *Id.* at 171.

Thus, Dr. Nelatury pleads sufficient facts that his act of publishing in open access fora addressed a matter of public concern.

### 3.    Qualified Immunity

Dr. Ford argues that the First Amendment claim against him, individually, should be dismissed under the qualified immunity doctrine. "Qualified immunity shields government actors from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is "clearly established" when "*every reasonable official* would have understood that what he is doing violates that right." *Id.* at 175 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). That is to say, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (quoting *Reichle*, 566 U.S. at 664).

"[T]he Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). A court may dismiss a complaint based on qualified immunity when "the immunity is

10

established on the face of the complaint." *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) (quoting *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996)). Dr. Nelatury's allegations about Dr. Ford's actions—recommending against promoting Dr. Nelatury, ¶¶ 59, 86, 129; ignoring Dr. Nelatury's traditional journal scholarship, ¶ 135; and punishing Dr. Nelatury for publishing in open access fora, ¶ 162—are all accepted as true. *Fowler*, 578 F.3d at 210–11. Thus, no disputes of fact prevent the Court from ruling now on the purely legal issues raised by Dr. Ford's qualified immunity defense.

As discussed above, Dr. Nelatury plausibly alleges a violation of his First Amendment right to free speech. However, the specific right at issue here—to convey a message through the expressive conduct of choosing a publication forum—is not clearly established. No authority binding on this Court has extended First Amendment protection of this right to public university professors, nor squarely held that such protection does not apply. *See Leveto*, 258 F.3d at 172–73 (granting motion to dismiss based on qualified immunity in a Fourth Amendment case where authorities neither applied the rule in question, nor held it did not apply).

The cases cited above led this Court to conclude that Dr. Nelatury's forum choice was expressive conduct. But none of these cases deal with academics or publishing, much less academic publishing. *See O'Brien*, 391 U.S. at 369 (Selective Service registrants' burning of draft cards); *Tenafly*, 309 F.3d at 154 (Orthodox Jews' attaching of *lechis* to utility poles); *Johnson*, 491 U.S. at 399 (protestor's burning of an American flag); *Montanye*, 218 F. App'x at 129–31 (public school teacher's assistance of a student receiving therapy); *Troster*, 65 F.3d at 1088 (prison guard's wearing of an American flag patch on his uniform). These cases permit a court to conclude, through reasoning by analogy and distinction, that Dr. Nelatury's conduct is expressive. They do not, however, establish that "*every reasonable official*" in Dr. Ford's

11

position "would have understood that what he is doing violates" a professor's First Amendment rights. *Zaloga*, 841 F.3d at 175 (quoting *Reichle*, 566 U.S. at 664).

Because any violation did not involve a clearly established right, Dr. Nelatury's First Amendment claim against Dr. Ford will be dismissed. However, PSU has not invoked qualified immunity, and the First Amendment claim against it will not be dismissed.

### B.      Discrimination Claims Under Title VII, Title IX, the ADEA, and the PHRA

Dr. Nelatury alleges that he experienced discrimination on the basis of race/national origin in violation of Title VII (Count 5) and the PHRA (Count 20); discrimination on the basis of age in violation of the ADEA (Count 8) and the PHRA (Count 23); and discrimination on the basis of sex in violation of Title IX (Count 11), Title VII (Count 14), and the PHRA (Count 26). These claims are partly based on occurrences during the 2018–19 academic year. *See, e.g.*, ECF No. 8 ¶¶ 237, 234 (Count 5); *id.* ¶¶ 271, 276 (Count 8). And they are partly based on occurrences during the 2020–21 academic year. *See, e.g.*, *id.* ¶ 228 (Count 5); *id.* ¶ 272 (Count 8).

### 1.      Statute of Limitations

Defendants argue that Dr. Nelatury's discrimination claims related to the 2018–19 academic year are time-barred. Several statutes of limitation are implicated. "To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997); 43 Pa. Stat. § 959(h). For a Pennsylvania plaintiff's Title VII or ADEA claim to be timely, a charge must have been filed with the EEOC within 300 days of the allegedly unlawful act. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013); *Seredinski v. Clifton Precision Prods. Co.*, 776 F.2d 56, 63 (3d Cir. 1985). The statute of limitations under Title IX is two years and does not depend on first taking any administrative action. *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989).

Dr. Nelatury alleges he was denied permission to supplement his dossier in January 2019 and denied a promotion in February 2019. He filed his charge with the EEOC and PHRC more than one year later, on November 13, 2020, and the complaint more than two years later, on October 11, 2021. He argues that his claims are timely, however, citing *Cooper v. Children's Behavioral Health, Inc.*, 2021 WL 4481093 (W.D. Pa. Sept. 30, 2021), which in turn cites *Miller v. Beneficial Management Corp.*, 977 F.2d 834 (3d Cir. 1992).

*Miller* established that the equitable "continuing violation doctrine" may be applied to failure-to-promote claims. The *Miller* plaintiff sued because she was not promoted to vice president. *Id.* at 840. The District Court granted summary judgment for the defendants, concluding that her claims were time-barred. *Id.* at 841. The Third Circuit reversed, holding that because the plaintiff's "promotion was not based on specific vacancies" and she "could have been promoted at any time," there was a continuing violation. *Id.* at 844 (quoting *EEOC v. Hay Assocs.*, 545 F. Supp. 1064, 1082–83 (E.D. Pa. 1982)). Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted).

Two legal developments since *Miller* are worthy of note. First, the Third Circuit has added a test, holding that "courts should consider at least three factors" when deciding whether there was a continuing violation:

> (1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

13

*Id.* The Third Circuit emphasized that "[t]he focus of the continuing violations doctrine is on affirmative acts of the defendants," *id.* at 293, and that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation," *id.* (quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

The second noteworthy development since *Miller* is the Supreme Court's holding that "[d]iscrete acts such as . . . failure to promote . . . are easy to identify" and therefore "[e]ach incident . . . constitutes a separate actionable 'unlawful employment practice'"—they may not be considered together as a continuing violation, and each is subject to the statutory 300-day limitation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)).[3]

There is no indication in *Morgan* that the plaintiff could have been promoted at any time, so District Courts in the Third Circuit have continued to follow *Miller* in cases where the plaintiff was not applying for a specific vacancy. *See, e.g.*, *Cooper v. Children's Behav. Health, Inc.*, 2021 WL 4481093, at *12 (W.D. Pa. Sept. 30, 2021); *Henderson v. Pa. State Univ.*, 2022 WL 838119, at *6 (M.D. Pa. Mar. 21, 2022). Still, *Morgan* counsels caution; a "connection" to other discriminatory acts is not enough for a continuing violation. 536 U.S. at 111 ("We have repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts." (quoting 42 U.S.C. § 2000e–5(e)(1)). "The 'continuing

---

[3] The Supreme Court held in *Morgan* that, for a hostile work environment claim, the third factor—permanency—"is not required to establish a continuing violation." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013). That is "because the entire hostile work environment encompasses a single unlawful employment practice." *Id.* (quoting *Morgan*, 536 U.S. at 117–18). Outside the hostile work environment context, however, the Third Circuit has continued to ask whether the "defendants' actions 'had a degree of permanence which should trigger [the plaintiff's] awareness of and duty to assert his[ ] rights.'" *Wisniewski v. Fisher*, 857 F.3d 152, 158 (3d Cir. 2017) (quoting Cowell, 263 F.3d at 292).

14

violation doctrine' applies only to a narrow class of . . . violations . . . ." *Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 740 (3d Cir. 2019).

In light of the Third Circuit's three-factor test and the narrowness of the continuing violation doctrine, I do not follow the same analytical path as the District Courts in *Cooper* and *Henderson*, which focused solely on whether a promotion could have been granted at any time. Instead, I apply the three-factor *Cowell* test. I integrate into that test the consideration of whether Dr. Nelatury's promotion to full professor could have taken place at any time.

In order to make out a continuing violation, Dr. Nelatury needs to allege a series of discriminatory actions connecting his 2019 non-promotion, which falls outside the 300-day statutory limit, with "the last act evidencing the continuing practice"—his 2021 non-promotion, which undisputedly "falls within the limitations period." *Cowell*, 263 F.3d at 292 (internal quotation marks omitted). The first *Cowell* factor is "subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation." *Id.* This factor weighs in favor of finding a continuing violation because the failure to promote in 2019 is the exact same discriminatory act as the failure to promote in 2021.

The second *Cowell* factor is "frequency—whether the acts are recurring or more in the nature of isolated incidents." *Id.* This factor weighs against finding a continuing violation because there was not a recurring or ongoing series of actions. Two years elapsed between the initial failure to promote and the more recent one, and Dr. Nelatury does not allege any discriminatory act that occurred in the intervening time. *See* ECF No. 8 at ¶¶ 59–129.

The third *Cowell* factor is "whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." 263 F.3d at

292. This is the appropriate factor under which to consider the promotion-at-any-time arguments. Dr. Nelatury contends "[t]here is nothing that would suggest that the University could not have promoted [him]" at any time since his first application in 2018–19. ECF No. 13 at 10–11. Defendants counter, correctly, that Dr. Nelatury's allegations do not allow this inference. Dr. Nelatury alleged that he applied for promotion in 2018–19. ECF No. 8 ¶ 49. "Ultimately"—that is, at the end of that application process—Dr. Ford recommended against promotion. *Id.* ¶ 59. When the Faculty Rights and Responsibilities Committee ruled in Dr. Nelatury's favor, the outcome was not an immediate promotion or even immediate reconsideration for one. Rather, he "was allowed to reapply for promotion during the 2020–21 academic year." *Id.* ¶ 87. Even considered in the light most favorable to Dr. Nelatury, with inferences drawn in his favor, the allegations do not show he could have been promoted at any time.

The unfavorable decision in 2019 should have "trigger[ed] [Dr. Nelatury's] awareness of and duty to assert [his] rights" because "the consequences of the act"—the lack of the full professor title and its accompanying pay raise—"would continue even in the absence of a continuing intent to discriminate." *Cowell*, 263 F.3d at 292. As it turned out, Dr. Nelatury was permitted to reapply in 2021. But when the 2019 decision was made, it was intended to be final. Dr. Nelatury seems to have understood it as a final decision; this is presumably why he took action and petitioned the faculty committee.[4]

---

[4] Dr. Nelatury has not argued that he waited to file his EEOC/PHRC complaint because the faculty committee was adjudicating his petition. Even if he did, the outstanding petition would not render the 2019 promotion decision non-final. *See Morgan*, 536 U.S. at 111–12 (explaining that an employee's union grievance did not render her termination "nonfinal"; rather, "the discriminatory act occurred on the date of discharge—the date that the parties understood the termination to be final," regardless of the ongoing grievance process).

Two *Cowell* factors weigh against a conclusion there was a continuing violation (frequency and permanency), while one factor weighs in favor (subject matter). Taken together, the factors do not show a continuing violation. The result of this factor-balancing exercise comports with the Third Circuit's admonition that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Id.* Although Dr. Nelatury suffered continual ill effects from the 2019 promotion decision, he does not allege continual unlawful acts by Defendants. This distinguishes his case from *Miller*, where the defendants committed a series of acts, each separated by weeks or a few months, culminating in the final decision that the plaintiff would never be promoted. 977 F.2d at 837–41.

For these reasons, Dr. Nelatury's Title VII, ADEA, Title IX, and PHRA claims for the 2019 refusal to supplement his dossier and 2019 refusal to promote in Counts 5, 8, 11, 14, 20, 23, and 26 will be dismissed. That does not mean, however, that the allegations about the 2019 incidents are irrelevant. Title VII does not "bar an employee from using the prior [time-barred] acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

### 2. Whether the non-time-barred claims are adequately stated

The burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), governs discrimination claims under Title VII, Title IX, the ADEA, and the PHRA. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26, 432 (3d Cir. 2013); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017). To show a prima facie case of sex, age, or national origin discrimination under the ADEA, Title VII, or the PHRA, a plaintiff must show: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) members outside the protected class were treated more favorably or the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Burton*, 707 F.3d at 426, 432. A prima facie case of sex

17

discrimination under Title IX requires a plaintiff to "allege (1) that he or she was subjected to discrimination in an educational program, (2) that the program receives federal assistance, and (3) that the discrimination was on the basis of sex." *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 550 (M.D. Pa. 2019); *Bougher v. Univ. of Pittsburgh*, 713 F. Supp. 139, 143–144 (W.D. Pa. 1989), *aff'd*, 882 F.2d 74, 77–78 (3d Cir. 1989).

Defendants argue that Dr. Nelatury has not pled sufficient facts to show that his non-promotion was discriminatory. To the contrary, Dr. Nelatury states a plausible claim for relief. He is male, of Indian national origin, over forty years of age and, as such, is a member of classes protected by Title VII, Title IX, the ADEA, and the PHRA. ECF No. 8 ¶¶ 223, 269, 309, 352, 446, 448; 2 U.S.C. § 1311(a); 20 U.S.C. § 1681; 29 U.S.C. § 623; 43 Pa. Stat. and Cons. Stat. § 955. Dr. Nelatury pleads that "[o]ver the past eighteen years [he] has been the faculty member at PSU-Behrend with the highest number of publications in traditional peer-reviewed journals." ECF No. 8 ¶ 32. He was subjected to adverse employment action because he has not been promoted from Associate Professor to Full Professor, despite applying. *Id.* at ¶ 49, 128. Finally, "[a] non-Indian faculty member was promoted by Dr. Ford ahead of Dr. Nelatury, notwithstanding the fact that she had a lesser publication record and the fact that the college-level promotion committee advised that Dr. Nelatury be promoted ahead of her." *Id.* at ¶ 458. Therefore, Dr. Nelatury's claims of discrimination related to the 2021 promotion decision will not be dismissed.

Defendants assert in a footnote that the PHRA claims against Dr. Ford should be dismissed because he allegedly engaged in direct discrimination and the statute "does not provide for liability for direct acts of discrimination, only aiding and abetting." ECF No. 11 at p. 16 n.6 (citing *Dici v. Commonwealth*, 91 F.3d 542, 552–53 (3d Cir. 1996)). The District Court in

*Toth v. Cal. Univ. of Pa.*, responding to this exact argument, explained that *Dici* "stands for the proposition that individual liability under § 955(e) can extend only to an employee who shares the discriminatory purpose and intent of the offending employer. The reasoning employed in *Dici* does not preclude the imposition of individual liability upon supervisory employees who implement unlawful acts of discrimination." 844 F. Supp. 2d 611, 647 (W.D. Pa. 2012). I agree with this reasoning. As another District Court put it, under *Dici*, "an individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998). Therefore, the PHRA claims against Dr. Ford will not be dismissed.

### C.    Retaliation Claims Under Title VII, Title IX, the ADEA, and the PHRA

Dr. Nelatury alleges that he was retaliated against in violation of Title VII for complaints of racial discrimination (Count 6) and sex discrimination (Count 15); in violation of Title IX for complaints of sex discrimination (Count 12); in violation of the ADEA for age discrimination (Count 9); and in violation of the PHRA for complaints of racial discrimination (Count 21), age discrimination (Count 24), and sex discrimination (Count 27).

To make out a prima facie case of retaliation under these statutes, a plaintiff must show that: (1) he engaged in activity protected by the statute; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between the two. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Doe*, 850 F.3d at 564.

Defendants' sole attack on this claim is that Dr. Nelatury has not pled that Dr. Ford knew about the protected activity. ECF No. 11 at 18–19. But Dr. Ford was named as a respondent in Dr. Nelatury's EEOC charge. *Id.* at ¶¶ 125–26. Dr. Nelatury's petition to the Faculty Rights and

Responsibilities Committee also directly implicated Dr. Ford: Dr. Nelatury complained of unfairness in the promotion process, *id.* at ¶¶ 73–76, and the Committee concluded that "Dr. Ford's review of Dr. Nelatury's promotion application violated Penn State policy," *id.* at ¶ 419. It can be inferred that Dr. Ford knew about a charge on which he was named as a respondent, and about an internal complaint that led to a ruling he had violated university policy. Therefore, the retaliation claims will not be dismissed.

### D.     Hostile Work Environment Claims Under Title VII, Title IX, the ADEA, and the PHRA

Dr. Nelatury alleges he was subjected to a hostile work environment in violation of Title VII on account of his race (Count 7) and sex (Count 16); in violation of Title IX on account of his sex (Count 13); in violation of the ADEA on account of his age (Count 10); and in violation of the PHRA on account of his race and national origin (Count 22), age (Count 25), and sex (Count 28).

To succeed on a hostile work environment claim under Title VII or the PHRA, the plaintiff must prove (1) intentional discrimination because of sex (2) that was severe and pervasive, (3) that subjectively affected the plaintiff detrimentally, (4) that would similarly affect a reasonable person, and (5) the employer is liable on a *respondeat superior* theory. *Mandel*, 706 F.3d at 167; *Renna v. PPL Elec. Utilities, Inc.*, 207 A.3d 355, 368 (Pa. Super. Ct. 2019). Similarly, the ADEA and Title IX also require the plaintiff to prove "severe and pervasive" discrimination. *See Howell v. Millersville Univ. of Pa.*, 749 F. App'x 130, 135 (3d Cir. 2018) (assuming that the ADEA permits a hostile work environment claim and holding that such a claim would require severe and pervasive discrimination); *see also DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (explaining that one element of a student's Title IX hostile environment claim is severe and pervasive discrimination).

Defendants are correct that Dr. Nelatury has not alleged severe and pervasive discrimination. A hostile work environment is one so "permeated with discriminatory intimidation, ridicule, and insult" that it becomes "abusive." *Morgan*, 536 U.S. at 116 (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The allegations do not reach this threshold. Dr. Nelatury does not allege insulting comments, taunting, the display of offensive cartoons, or the like. Being denied promotion and the opportunity to supplement a dossier does not create a workplace "permeated with . . . intimidation, ridicule, and insult." *Id.* Therefore, the retaliation claims will be dismissed.

### E. Discrimination, Retaliation, and Hostile Work Environment Claims Under Section 1981 and Motion for Leave to Amend

Dr. Nelatury alleges that Defendants violated 42 U.S.C. § 1981 by discriminating against him (Count 2), retaliating against him (Count 3), and subjecting him to a hostile work environment (Count 4). Defendants argue that the claims should be dismissed because § 1981 does not confer a private right of action against state and municipal actors such as PSU and Dr. Ford. Defendants are correct that these claims, as they currently stand, are subject to dismissal. *McGovern v. City of Phila.*, 554 F.3d 114, 120–21 (3d Cir. 2009) (holding that Congress did not create a remedy against state actors under § 1981). Dr. Nelatury seeks leave to amend his complaint to bring these claims through 42 U.S.C. § 1983. ECF No. 19 at 2–3. The proposed amendment, if permitted, would cure the problem because "while § 1981 creates *rights*, § 1983 provides the *remedy* to enforce those rights against state actors." *McGovern*, 554 F.3d at 116.

A "court should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision to grant or deny a motion for leave to amend is within the "sound discretion of the district court." *Cornell & Co. v. Occupational Safety & Health Rev. Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978). Absent "undue delay, bad faith, or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party . . . [or] futility of amendment," leave should be

given. *Id.* Amendment is futile when the complaint as amended would not "withstand a renewed

motion to dismiss." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872,

878 (3d Cir. 2018) (citation omitted). Defendants argue leave should not be granted for four

reasons.

      ***Dr. Nelatury failed to cure the deficiency previously.*** First, Defendants contend that Dr.

Nelatury did not take advantage of earlier opportunities to amend after the parties' December

2021 and January 2022 meet-and-confers. ECF No. 28 at 2–3. They argue this constitutes the

kind of "repeated failure to cure deficiencies" that justifies denial of leave. *Cornell*, 573 F.2d at

823. However, the cases Defendants cite in support of this argument are distinguishable. In

*Heraeus Medical GmbH v. Esschem, Inc.*, the plaintiff sought to amend over two years after

filing the complaint and about a month before the end of discovery, and amendment would have

"necessitate[d] a new wave of motion practice." 321 F.R.D. 215, 218 (E.D. Pa. 2017). In *Cureton

v. National Collegiate Athletic Association*, the plaintiff sought to amend three years after the

complaint was filed and after summary judgment was entered; amendment would have required

"burdensome new discovery and significant new trial preparation." 252 F.3d 267, 273–74, 275–

76 (3d Cir. 2001). Here, it has been less than a year since the complaint was filed; discovery is

yet to begin; amendment would not spur a new round of motions; and—as Defendants

acknowledge—the proposed amendment "does not change any of the factual allegations." ECF

No. 28 at 4. In these circumstances, Dr. Nelatury's earlier failure to amend before does not doom

his effort to do so now.

*Race versus national origin.* Second, Defendants argue that amendment would be futile because § 1981 prohibits discrimination only on the basis of race, not national origin. The Supreme Court examined this issue in a case where a college denied tenure to a professor who described himself as Iraqi-born and "of the Arabian race." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 606 (1987). The Court noted that when § 1981 was passed in the mid-nineteenth century, groups such as "Finns," "Russians," "Italians," and "Basques" were described as "separate races." *Id.* at 611–12. Section 1981, the Court held, protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," regardless of whether such discrimination "would be classified as racial in terms of modern scientific theory." *Id.* at 613. Therefore, the professor stated a claim. *See id.*

Similarly here, amendment would permit Dr. Nelatury to state a claim. True, his complaint repeatedly refers to his Indian origin and others' non-Indian origin. *See, e.g.*, ECF No. 8 ¶¶ 20, 67, 88. But he also describes himself as "non-Caucasian (white)," "a person of color," and "a person of dark skin color." ECF No. 8 ¶¶ 20, 66, 173. And in his allegations, race and national origin often appear together. *See, e.g.*, *id.* at ¶¶ 89, 95, 145, 190, 192, 216, 469. This is sufficient to state a claim under § 1981. *See St. Francis Coll.*, 481 U.S. at 613. Defendants argue otherwise, citing *Mudie v. Philadelphia College of Osteopathic Medicine*, 577 F. Supp. 3d 375 (E.D. Pa. 2021). But *Mudie* observes that courts have "permitted claims based on national origin and race, ethnicity, or ancestry to proceed," while "repeatedly dismiss[ing] claims that are based solely on national origin" or on a combination of "national origin and other non-protected characteristics." *Id.* at 383 (citation omitted). Dr. Nelatury advances claims of the first type—that is, the type that has been permitted to proceed. So the fact that his claims are based on a combination of national origin and race does not mean amendment would be futile.

*Insufficiency of the allegations.* Third, Defendants argue that amendment would be futile because Dr. Nelatury's factual allegations, which would not be changed by his proposed amendment, fail to state claims for § 1981 discrimination, retaliation, and hostile work environment. A § 1981 discrimination claim requires a plaintiff to establish "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." *Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017) (citation omitted). First, as explained, Dr. Nelatury alleges that he belongs to a racial minority. Second, for the same reasons given above with regard to the discrimination claims under Title VII, Title IX, the ADEA, and the PHRA, Dr. Nelatury has adequately alleged that Defendants intended to discriminate against him by deliberately preventing him from receiving a deserved promotion. And third, § 1981 reaches employment discrimination. *See, e.g.*, *McGovern*, 554 F.3d at 116. Therefore, amendment of the § 1981 discrimination claim (Count 2) would not be futile (except for the portion of Count 2 that is time barred, as explained below).

The elements of § 1981 claims for retaliation and hostile work environment are the same as the elements of those claims under Title VII. *Castleberry*, 863 F.3d at 263, 267. Therefore, for the same reasons explained above with regard to the retaliation and hostile work environment claims under Title VII, Title IX, the ADEA, and the PHRA, amendment of the § 1981 hostile work environment claim (Count 4) would be futile and amendment of the § 1981 retaliation claim (Count 3) would not.

*Statute of limitations.* Finally, Defendants argue that the portion of Count 2 based on failure to promote in February 2019 is time-barred. A § 1981 claim brought through § 1983 is governed by the § 1983 statute of limitations. *See McGovern*, 554 F.3d at 115–21 (rejecting the

24

plaintiff's attempt to apply the § 1981 four-year statute). In § 1983 actions, "federal courts apply the state's statute of limitations for personal injury," and "Pennsylvania's statute of limitations for personal injury is two years." *Sameric Corp. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998) (citing 42 Pa. Cons. Stat. Ann. § 5524).

Dr. Nelatury alleges he was denied permission to supplement his dossier in January 2019 and denied a promotion in February 2019. He filed this lawsuit more than two years later, on October 11, 2021. For the reasons explained in the discussion of the statute of limitations for the discrimination claims, *see* Part IV.B.1 above, the continuing violation doctrine cannot render Count 2 timely to the extent it advances claims based on the failure to supplement Dr. Nelatury's dossier in January 2019 and the failure to promote in February 2019. This portion of Count 2 will be dismissed.

In sum, Dr. Nelatury's motion for leave to amend his complaint will be granted in part. He will be permitted to amend Count 2 (§ 1981 discrimination) and Count 3 (§ 1981 retaliation) as requested in his motion and shown in the proposed amended complaint. However, the portion of Count 2 that advances a claim for allegedly discriminatory actions in January and February 2019 is time-barred and will be dismissed. The remainder of Counts 2 and 3, as amended, will not be dismissed. It would be futile to amend Count 4 (§ 1981 hostile work environment), so leave to amend will not be granted and that count will be dismissed.

### F.    Breach of Contract Claims

Dr. Nelatury alleges that PSU committed a variety of breaches of contract in connection with his non-promotion (Counts 17, 18, and 19). "To successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010) (citation omitted).

Although the Complaint is not entirely clear on this point, it seems Dr. Nelatury alleges the tenure policy was a binding contract for two different reasons. The first is his allegation that "an internal employee handbook and/or employer policies may give rise to a binding contract between an employer and an employee." ECF No. 8 ¶ 425. As a point of Pennsylvania law, this is correct. "A handbook distributed to employees as inducement for employment may be an offer and its acceptance a contract." *Morosetti v. La. Land & Expl. Co.*, 564 A.2d 151, 152 (Pa. 1989).

But there appears to be a significant distinction between this case and cases in the *Morosetti* line: Dr. Nelatury is employed under a contract and thus is not an at-will employee. *See id.* at 155 (Larsen, J., dissenting) (noting at-will status of *Morosetti* plaintiffs). This leads to the second reason Dr. Nelatury alleges the tenure policy was a binding contract: because it was "incorporated into the general employment contract between full-time faculty and the University." ECF No. 8 ¶ 429.

Dr. Nelatury attached to his complaint a copy of University Policy AC61, "Faculty Contracts." ECF No. 8-4. This policy is not itself a contract, but it provides that "[a]ll standing appointment faculty members will be employed on a . . . contract." *Id.* at 1. Policy AC61 "establish[es] the terms and conditions for making standing appointment offers to, and contracting the services of, individuals classified as academic . . . ." *Id.* at 1. The policy states that faculty contracts "should include . . . [a] statement that provisional appointments and appointments with tenure are subject to the terms and conditions of University tenure policies." *Id.* at 2–3. Dr. Nelatury also attached to his complaint a copy of Policy AC23, "Promotion and Tenure Procedures and Regulations." ECF No. 8-1. Reading these two documents together, the tenure policy is incorporated into the employment contracts governing all faculty hires.

26

Therefore, the complaint and its attachments permit the inference that Dr. Nelatury is employed under a contract whose terms include the tenure policy.[5]

Because the complaint and attachments permit the inference that a contract existed, it must be determined whether Dr. Nelatury has adequately alleged a breach. His three contract claims contain a profusion of breach allegations.

Dr. Nelatury alleges that PSU "failed to afford equal treatment to the open access publications [he] authored." ECF No. 8 ¶ 399(a). But the two documents discussing open access publication, which he attached to his complaint, are not incorporated into faculty contracts under the terms of Policy AC61; indeed, Policy AC61 does not mention them. *See* ECF No. 8-4. Therefore, ¶ 399(a) of the complaint does not sufficiently allege a breach.

Dr. Nelatury alleges that Dr. Ford failed to forward his dossier for review by the university-wide committee. ECF No. 8 ¶¶ 399(b), 441(b). But he does not cite any provision of the faculty contracts policy or the tenure and promotion policy that was breached by this inaction. Therefore, ¶¶ 399(b) and 441(b) of the Complaint do not sufficiently allege a breach.

Dr. Nelatury makes several allegations about how his application was reviewed and the results of the review. He alleges that PSU disregarded his publications in traditional peer-reviewed publications, ECF No. 8 ¶ 399(c), his service to the university, *id.* ¶ 399(d), and his peer review report, *id.* ¶ 438. He also alleges that Dr. Ford did not "apply [the policy regarding student teaching evaluations] in a facially neutral manner," *id.* ¶ 441(c), or "[s]et forth the particulars of his discussion with the college-wide ad hoc committee regarding the divergence of

---

[5] True, the tenure policy became effective in 2018, well after Dr. Nelatury was hired in 2003. Presumably, however, this tenure policy replaced an older one, as the policy indicates a version was first published in 1952; and presumably, faculty contracts incorporate the tenure policy that currently controls.

opinion with respect [to] recommending Dr. Nelatury for promotion," *id.* ¶ 441(a). Although

these allegations are phrased in terms of PSU failing to follow the tenure policy, their essence is

not a contractual breach—but that Dr. Nelatury's performance should have been assessed

differently and the promotion decision should have turned out differently.

Dr. Nelatury gets at the nub of the question when he argues that "[t]he issue raised in the

complaint is whether there was a binding agreement that assured Dr. Nelatury's promotion."

ECF No. 13 at 20. The tenure policy assures no such thing. It is replete with language

emphasizing that review is subjective. *See, e.g.*, ECF No. 8-1 at 4 ("Tenure and promotion

standards . . . cannot be fixed and absolute . . . ."); *id.*at 2 ("A formal statement of criteria for

tenure and promotion is necessary but not sufficient . . . . Rather, general and broad guidelines

will permit the exercise of skilled professional and academic judgment in their interpretation and

application."); *id.* at 3 ("[T]he presumption is that recommendations based on the professional

expertise and competence of the faculty will *usually* be heeded." (emphasis added)). Therefore,

¶¶ 399(c), 399(d), 438, 441(a), and 441(c) do not sufficiently allege a breach.[6]

Dr. Nelatury alleges he was not informed how student assessments of his teaching

effectiveness would factor into the promotion decision. *Id.* ¶¶ 437, 441(c). The tenure policy

provides that policies and procedures governing promotion "should be made widely known."

ECF No. 8-1 at 2; *see also id.* at 3 (same). Therefore, these allegations state a breach of contract.

Dr. Nelatury alleges that Dr. Ford rejected the ad hoc review committee that had been

appointed, replaced it with his own, and did not allow Dr. Nelatury to supplement his dossier, all

---

[6] Paragraph 441(c) nests two allegations together: that Dr. Ford failed to [1] "[e]xplain the SRTE policy to Dr. Nelatury and [2] apply that policy in a facially neutral manner." ECF No. 8 at ¶ 441(c). The second portion of ¶ 441(c) will be dismissed as just explained. The first portion of ¶ 441(c), alleging failure to explain the policy, will be addressed below.

of which led the faculty committee to conclude that Dr. Ford did not follow the tenure review process. ECF No. 8 ¶¶ 416–19. These allegations state a breach of contract claim, because PSU's faculty committee found the tenure policy had not been followed.

To summarize, Count 17 will be dismissed because ¶¶ 399(a)–(d) fail to allege a breach of contract. Count 18 will not be dismissed because ¶¶ 416–19 sufficiently allege a breach of contract. And Count 19 will be partly dismissed because, while ¶¶ 438, 441(a), 441(b), and part of ¶ 441(c) fail to allege a breach of contract, ¶ 437 and part of ¶ 441(c) allege a breach.

## V.    CONCLUSION

For the reasons explained above, the Motion for Leave to Amend will be granted in part and denied in part. The Motion to Dismiss will also be granted in part and denied in part.

An appropriate order follows.