## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUDARSHAN NELATURY, | ) | Civil Action No. 1:21-cv-00279-SPB |
| | ) | |
| Plaintiff, | ) | The Hon. Susan Paradise Baxter |
| | ) | U.S. District Judge |
| vs. | ) | |
| | ) | |
| THE PENNSYLVANIA STATE | ) | |
| UNIVERSITY and RALPH FORD, | ) | FILED ELECTRONICALLY |
| | ) | |
| Defendants | ) | JURY TRIAL DEMANDED |

### SECOND AMENDED COMPLAINT IN CIVIL ACTION

Plaintiff Sudarshan Nelatury ("Plaintiff" or "Dr. Nelatury"), by and through undersigned counsel, files this Second Amended Complaint in Civil Action stating as follows:

### I. PARTIES

1.      Dr. Nelatury is an individual residing in Erie County, Pennsylvania.

2.      Defendant Pennsylvania State University ("Penn State") is a state-related institution of post-secondary education that maintains a campus located at 4701 College Drive, Erie, PA 16563.

3.      Defendant Ralph Ford ("Dr. Ford") is an individual who maintains a place of business at 4701 College Drive, Erie, PA 16563.

### II. JURISDICTION

4.      The jurisdiction of this Court over the matters set forth in this Complaint is set forth at 28 U.S.C. § 1331, 28 U.S.C. § 1367, and at 42 U.S.C. § 2000e-5(f)(3).

### III. VENUE

5.      The matters complained of in this Complaint occurred in Erie County, Pennsylvania, in the Western District of Pennsylvania; therefore, venue is appropriate in this Court.

## IV.  ADMINISTRATIVE EXHAUSTION

6.      On or about November 13, 2020, Dr. Nelatury filed a charge alleging discrimination on the basis of race, sex, national origin, and age against Penn State and Dr. Ford with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.      Dr. Nelatury cross-filed the aforementioned charge (which was docketed by the EEOC at 533-2021-00311) with the Pennsylvania Human Relations Commission ("PHRC").

8.      Subsequently, on or about April 19, 2021, Dr. Nelatury filed an additional charge with the EEOC alleging retaliation; this charge was docketed at 533-2021-01159.

9.      Dr. Nelatury also cross-filed the aforementioned charge with the PHRC.

10.      On or about July 20, 2021, undersigned counsel requested the issuance of "Right to Sue" notices as to both of the aforementioned charges.

11.      On or about July 21, 2021, the EEOC issued a Right to Sue notice as to the charge docketed at 533-2021-00311.

12.      On or about August 12, 2021, the EEOC issued a Right to Sue Notice as to the charge docketed at 533-2021-01159.

13.      Dr. Nelatury's federal claims are now ripe for adjudication.

14.      Since more than one year has passed since he filed his initial administrative complaint with the PHRC, Dr. Nelatury's claims under the Pennsylvania Human Relations Act are now ripe for adjudication.

## V.  FACTS

15.      Dr. Nelatury is currently employed by the Behrend College of Penn State ("PSU–Behrend" or "Penn State–Behrend") as an Associate Professor in the Department of

2

Electrical and Computer Engineering.

16.     PSU–Behrend is a component of Penn State.

17.     PSU–Behrend is primarily an undergraduate unit, unlike the main Penn State campus at University Park.

18.     As a branch campus of Penn State, the primary focus of the PSU–Behrend faculty is on teaching.

19.     Faculty at PSU–Behrend lack the aid of graduate assistants and, as such, cannot be expected to produce research at the same levels as their colleagues at University Park.

20.     Dr. Nelatury is a non-Caucasian (white) individual who is of Indian and South Asian national origin.

21.     Dr. Nelatury received a Ph.D. from Osmania University in Hyderabad, India in 1996.

22.     Dr. Nelatury has taught at PSU–Behrend since 2003.

23.     Prior to teaching at PSU–Behrend Dr. Nelatury taught at Villanova University.

24.     Dr. Nelatury was granted an O-1 visa in 2003; these are normally issued only to individuals with "extraordinary abilities or achievement."

25.     Dr. Nelatury later received residency per an EB-1 employment-based immigration classification; again, this status is normally reserved for high-achieving individuals.

26.     Dr. Ford is currently the Dean/Chancellor of Penn State–Behrend.

27.     Tim Kurzweg ("Dr. Kurzweg") is the School Director of the Penn State–Behrend School of Engineering.

28.     During the time relevant to this complaint Tom Hemminger ("Dr. Hemminger") was the Chair of Department of Electrical and Computer Engineering; he has since been replaced by Dr.

Fethi Belkhouche.

29.     Dr. Nelatury's primary areas of research focus are electrical engineering, electromagnetics, signal processing, engineering education, and allied fields.

30.     Dr. Nelatury has authored eight books, four book chapters, 23 book sections, and 37 peer-reviewed journal papers.

31.     Dr. Nelatury has also participated and published in 34 conference proceedings.

32.     Over the past eighteen years Dr. Nelatury has been the faculty member at PSU–Behrend with the highest number of publications in traditional peer-reviewed journals.

33.     Dr. Nelatury's books have been published by, *inter alia*, CRC Press and the Oxford University Press; these publications have been used throughout the world and have received high accolades.

34.     In addition, Dr. Nelatury has coauthored 48 papers in open-access journals.

35.     Dr. Nelatury was awarded tenure at PSU–Behrend in 2009.

36.     For seventeen years Dr. Nelatury has received almost consistently an "excellent" rating in terms of research and has been the recipient of "Outstanding Research Award" and "Council of Fellows Research Award."

37.     Dr. Nelatury's work has been highly rated by platforms such as Research Gate and Google Scholar.

38.     Dr. Nelatury is a senior member of the Institute of Electrical and Electronics Engineers ("IEEE").

39.     Dr. Nelatury has been recognized within the wider scientific community; for instance he developed a uniqueness theorem and proposed a technique for estimating the parameters of

4

induction motors (later named the "Nelatury Method") that was published in *IEEE Transactions on Energy Conversion*.

40.     One of Dr. Nelatury's papers in *Digital Signal Processing* was ranked 2nd among top 25 papers and another in *Electromagnetics* was ranked third among the top ten.

41.     Dr. Nelatury also signed a contract as a contributor for a work entitled *Elements of Electromagnetics, Seventh Edition* by Matthew Saidku that was published by Oxford University Press; Dr. Nelatury presented his contract to Dr. Kurzweg when applying for promotion.

42.     Dr. Nelatury has also been rated as "excellent" in the area of teaching from his peers.

43.     Dr. Nelatury has also received consistently high ratings for teaching from his students.

44.     In addition, Dr. Nelatury served in the PSU–Behrend Faculty Senate.

45.     In 2015, Dr. Nelatury met with Dr. Ford regarding promotion to the rank of full Professor.

46.     Dr. Ford said that the promotion process would start with the school ad hoc committee.

47.     Dr. Nelatury then started the promotion process.

48.     As Dr. Nelatury started to take the initial steps for promotion, between 2015 and 2017, Russ Warley ("Dr. Warley"), who succeeded Dr. Ford as director of the Penn State–Behrend School of Engineering, continually discouraged Dr. Nelatury from applying promotion on the basis that Dr. Ford would not approve the application.

49.     During the 2018-19 academic year, Dr. Nelatury applied for promotion from the rank of Associate Professor to the rank of full Professor.

50.     In conformity with University procedures Dr. Nelatury compiled a dossier of his

5

academic work to be reviewed by the University promotions committee.

51.     Dr. Nelatury consented to having his dossier reviewed by an ad hoc committee of three faculty members–Jeff Pinto, Dr. Hemminger, and Diane Parente.

52.     However, Dr. Nelatury's dossier was reviewed by three other faculty members whose academic backgrounds were not in electrical engineering; one reviewer was from the Biology Department, another was from the Business Department, and the third was from outside of Penn State–Behrend.

53.     At this time Dr. Nelatury met with Ed Evans ("Mr. Evans"), then the acting director of the Penn State–Behrend School of Engineering, who discouraged Dr. Nelatury from applying, implying that Dr. Ford would not approve of his application.

54.     After Mr. Evans stepped down, Dr. Kurzweg also discouraged Dr. Nelatury from applying, again suggesting/implying that Dr. Ford would not approve.

55.     Moreover in January 2019, Dr. Kurzweg did not allow Dr. Nelatury to supplement his dossier with new information about his Fall 2018 SRTEs (student rating of teaching effectiveness) and letters that commended his work; the University Senate later would repudiate Dr. Kurzweg's failure to allow Dr. Nelatury to supplement his record.

56.     The courses that Dr. Nelatury teaches are considered the most difficult in the Department; this fact was admitted in Dr. Nelatury's annual performance evaluations as well as by the PSU–Behrend Promotion and Tenure Committee.

57.     His Fall 2018 scores in the two hardest courses, Electromagnetic Fields and Waves and Communication Systems, were 6.63/7.0 and 6.0/7.0.

58.     Around this time Dr. Nelatury developed stress-related physiological ailments which

required medical attention.

59.     Ultimately, in February 2019, Dr. Ford, the Chancellor, recommended against promoting Dr. Nelatury to the rank of full professor.

60.     Dr. Ford has had a history of taking adverse action against faculty who are not of U.S. national origin.

61.     For instance, Dr. Ford contributed towards removing a faculty member of non-U.S. national origin from the tenure track in May 2018.

62.     The aforementioned faculty member, who is a non-Caucasian individual of Egyptian national origin, was a professor of computer engineering at Penn State–Behrend.

63.     The aforementioned faculty member had accused a number of students enrolled in his course of plagiarism.

64.     Dr. Ford's son was among the students whom the faculty member had accused of plagiarism.

65.     Dr. Ford's conduct towards that faculty member suggests a pattern of discriminatory conduct towards faculty who are not Caucasian (white) or who are not of U.S. national origin.

66.     Dr. Nelatury is a person of dark skin color.

67.     In Spring 2019, Dr. Ford recommended the promotion of a much younger non-Indian female faculty member even though the college ad hoc committee recommended that Dr. Nelatury be promoted over her.

68.     Moreover, members of the college ad hoc committee assured Dr. Nelatury that faculty

with an h-index score[1] between 12 and 24 would satisfy the criteria for promotion to full Professor; Dr. Nelatury's h-index score lies whin that range.

69.     Moreover, consistent with University policy that requires consideration of a promotion candidate's life-time research accomplishments, the committee members characterized Dr. Nelatury's accomplishments as "impressive."

70.     Ultimately, in January 2020, Dr. Nelatury filed a petition with the PSU Senate Committee on Faculty Rights and Responsibilities ("FRRC").

71.     In his petition, Dr. Nelatury noted that his publication record was superior to that of the Chancellor of PSU–Behrend, Dr. Ford, as well as the directors of the PSU–Behrend School of Engineering and the chair of the Engineering Department; he did so because the tenure and promotion policy of Penn State clearly directs that the criterion of "relative standing" must be followed.

72.     Per University Policy AC 23 Promotion and Tenure Procedures and Regulations (appended hereto as "Exhibit A"), "[t]he review process for tenure and promotion is concerned with the academic and professional merits of particular candidates, judged in reference to all alternative candidates, including prospective faculty members.  Tenure and promotion standards, therefore, cannot be fixed and absolute, but will reflect to some extent the varying competitive positions of the University in attracting faculty.  Accordingly, valuations will be influenced by such considerations of relative standing."  Exhibit A at 4.

73.     In his petition, Dr. Nelatury alleged procedural unfairness in terms of a) the

---

[1]  The "h-index score" is a metric that measures both the productivity and citation impact of academic publications.

composition of the school ad hoc review committee made up of faculty outside of electrical engineering and b) Dr. Ford's failure to allow Dr. Nelatury to supplement his dossier.

74.     Shortly after the submission of the aforementioned petition, Dr. Nelatury was informed via letter from Greg Ziegler, FRRC chair, that the FRRC would review Dr. Nelatury's procedural claims, while his discrimination claims would be reviewed by the University Affirmative Action office.

75.     In June 2020, the FRRC found in favor of Dr. Nelatury with respect to the composition of his dossier and ordered that he be allowed to supplement his dossier.

76.     The FRRC found that while the due date to add material to the promotion dossier was in February 2019, Dr. Kurzweg prevented Dr. Nelatury from doing so in January 2019.

77.     The FRRC further ruled that Dr. Nelatury be allowed to resubmit his application for promotion during the 2021-22 academic year.

78.     In September 2020, the FRRC found while there was no procedural error with respect to the formation of the ad hoc committee, it did find that Dr. Nelatury should have been permitted to supplement his dossier.

79.     The Vice Provost of Faculty Affairs, Dr. Bieschke, ordered that Dr. Nelatury's dossier be submitted for reevaluation and that his review be carried through "all university levels," which was preemptively blocked by Dr. Ford.

80.     Although he had demonstrated that he was qualified, Dr. Nelatury has not been promoted to the rank of full Professor.

81.     Dr. Nelatury's complaints regarding discrimination have not been adequately addressed.

82.    Although he had been recommended for promotion by the college ad hoc review committee, Dr. Nelatury has not yet been promoted.

83.    A substantially younger female professor was promoted notwithstanding the fact that she was not recommended for promotion unanimously by the College Committee.

84.    The denial of promotion, the procedural irregularities with respect to his initial application for promotion, the ongoing review of Dr. Nelatury's dossier, and the failure to address his concerns regarding discrimination all constitute adverse employment actions.

85.    Dr. Ford ignored the primary criterion for promotion, which is "relative merit."

86.    Dr. Ford contributed to the decision not to promote Dr. Nelatury.

87.    Dr. Nelatury successfully grieved the adverse decision by Dr. Ford on the grounds of procedural unfairness, and was allowed to reapply for promotion during the 2020-21 academic year.

88.    The circumstances surrounding the aforementioned adverse employment actions suggest that Dr. Nelatury was treated less favorably than others who were not of Indian descent and/or who were not male and/or who were substantially younger.

89.    Dr. Nelatury was subjected to adverse treatment on the basis of his race, national origin, age, and gender.

90.    The prior review was insulting, destructive of time and resources, discriminatory, and injurious to Dr. Nelatury's health.

91.    During the course of the promotion process, Dr. Nelatury has faced continual rejection, prejudice, and procedural errors in dealing with his dossier.

92.    Throughout this process, Dr. Nelatury has undergone extreme stress resulting in

10

invasive heart treatment; he has also been treated for depression.

93.     The new review involved many of the same actors including Dr. Ford and Dr. Kurzweg.

94.     Despite his high performance, Dr. Nelatury has been subjected to a hostile work environment.

95.     White and/or non-Indian faculty have been promoted on the basis of only a few open-access papers.

96.     Moreover, Dr. Ford ignored Dr. Nelatury's four-year service on the University Faculty Senate and on the Promotion and Tenure Committee.

97.     Even though Penn State SRTE policy maintains that the SRTEs must be viewed along with peer-reviews of faculty members for promotion and tenure; in the present case, both Dr. Kurzweg and Dr. Ford did not consider Dr. Nelatury's peer-review report.

98.     Numerous times Dr. Nelatury received SRTEs greater than 6.0 on a scale of 7.0; for instance, in Fall 2019 his scores in three courses were 6.62, 6.54, 6.4 out of 7.

99.     In rare instances he received lower scores in low-level courses (which were team-taught courses), but faulting his teaching based on these outliers to the total exclusion of his exemplary high numbers shows pretext.

100.    When Dr. Nelatury had asked Dr. Hemminger to reassign a lower level course to a non-Indian faculty member Dr. Hemminger did not do so; he failed to do so for the purpose of bolstering that individual's SRTE scores.

101.    The aforementioned course, "EDSIGN 100S," is a team-taught course and faculty teaching this course routinely receive low SRTEs.

102.    The fact that teaching responsibilities for EDSIGN 100S were not assigned away from Dr. Nelatury depressed his SRTE scores artificially.

103.    Dr. Nelatury was assigned about 13 different courses, most of them being mathematically hard and needed extensive preparation to teach.

104.    Dr. Nelatury received an "Excellent" rating in his peer-review report authored by faculty in electrical and computer engineering that was given based on actual classroom visits.

105.    The College-level review committee also noted that Dr. Nelatury was also assigned an unusually large number of student advisees.

106.    Dr. Warley, the former director of school of engineering, commented that Dr. Nelatury's research had been prolific and he asked him to "cut-back" on the publications.

107.    Dr. Warley also characterized Dr. Nelatury's overall performance as being very good to excellent.

108.    Dr. Warley had prepared a letter praising Dr. Nelatury's scholarly output, but Dr. Ford blocked Dr. Nelatury from including this document in his dossier.

109.    Dr. Nelatury was unfairly penalized for his publication in "open source" formats, and Dr. Ford unfairly disregarded Dr. Nelatury's output in traditional journals.

110.    However, in April 2015, the Penn State Senate made a resolution that all open access publications should be considered as scholarly contributions; this resolution was subsequently endorsed by the University administration.

111.    "Open access" involves the free and open publication of academic papers online so as to eliminate technological and financial barriers to access.

112.    Publication in open access fora allows for publications to be published faster and

disseminated to a wider audience than traditional publications.

113.    The general public can access open access publications for free.

114.    Open access publications tend to have more flexible length requirements; therefore, it is possible to publish more in depth descriptions of experiments and results in open access publications.

115.    Highly regarded institutions such as Stanford University and the Massachusetts Institute of Technology have opened open access publication channels.

116.    According to the University's own open access policy (Policy ACO2, appended hereto as "Exhibit B"), "[t]he University is committed to disseminating its research as widely as possible.  As Pennsylvania's land-grant university, the University is dedicated to making scholarly research available to the Commonwealth and around the world. In furtherance of its mission of teaching, research, and public service, the University adopts a policy of open access to Scholarly Articles by University Researchers."  Exhibit B at 1.

117.    In 2019, the PSU Senate Committee on Libraries, Information Systems, and Technology reached the following assumptions regarding open access publication ("Open Access Policy Recommendations," appended hereto as "Exhibit C"): "Publicly funded research should be made available to the public.  Open Access and Open Source promote timely and innovative research.  Open Access and Open Education resources may help address affordability of education. Open Access can help address the academic journal subscription cost inflation crisis."  Exhibit C at 2.

118.    According to the aforementioned policy recommendation, the goal of open source publication was to make research conducted at PSU more accessible throughout the world.

13

119.    The University's resolution in favor of open access publication (which was endorsed by the University president, Eric Baron) prompted Dr. Nelatury to publish in open access fora while simultaneously working on this textbooks.

120.    Open access scholarship is peer reviewed scholarship that is made available free-of-charge by academic publishers on the internet.

121.    Although Dr. Nelatury had numerous high-quality papers in reputed journals and books to his credit (including papers published on traditional platforms, about 106 traditional publications out of 154 total publications), Drs. Kurzweg and Ford focused on the remaining 48 open source publications which they, contrary to Penn State policy, discounted as scholarly publications.

122.    Official policy at Penn State supports publication in open source journals, and the Penn State Office of the Executive Vice President and Provost has committed to funding $45,000 in grants to support open access journals.

123.    Rather than perform a summative, unbiased evaluation of Dr. Nelatury's work, Drs. Ford and Kurzweg cherry-picked certain publication so as to reach a pre-determined conclusion.

124.    Specifically, in his February 2021 evaluation of Dr. Nelatury, Dr. Kurzweg unfairly claimed that the open access journals that Dr. Nelatury and his collaborators published in "advertise[d] a quick turn around from submission and publication."

125.    In November 2020, Dr. Nelatury filed an administrative charge alleging, *inter alia*, discrimination on the basis of race, national origin, and gender with the EEOC.

126.    Dr. Ford was named as a respondent to the aforementioned charge.

127.    The aforementioned actions both constitute activities protected by Title VII.

128.    Dr. Nelatury reapplied for promotion during the 2020-21 academic year, and was

14

recommended for promotion by the college-wide ad hoc committee.

129.    However, Dr. Ford did not recommend Dr. Nelatury for promotion.

130.    Dr. Ford's failure to recommend Dr. Nelatury for promotion blocked any chance for promotion that Dr. Nelatury might have had during the 2020-21 academic year.

131.    Dr. Ford also did not forward Dr. Nelatury's application to the University Promotion and Tenure Review Committee ("University-wide Committee"), thereby attempting to block Dr. Nelatury's progress towards promotion.

132.    Vice-Provost Bieschke stated that the review should go through all university levels, but Dr. Ford preemptively stopped the same.

133.    Moreover, University regulations require Dr. Ford to consult with the college-wide ad hoc committee to reconcile their divergent evaluations of Dr. Nelatury.

134.    While Dr. Ford wrote that he met with the college-wide ad hoc committee on February 22, 2021 to discuss the divergent evaluations, he did not mention what was discussed during this meeting.

135.    Dr. Ford's evaluations of Dr. Nelatury's scholarship focused on his work on open access and largely ignored his work is traditional journals.

136.    Dr. Ford completely discounted Dr. Nelatury's work in writing textbooks published by Oxford University Press and CRC Press.

137.    Dr. Ford also ignored the open access policy that was passed by the University Senate and ratified by the University President; Dr. Nelatury's input should have been considered in light of this policy which also is conducive to the rapid development of scientific and technical fields.

138.    Dr. Nelatury has been denied promotion.

139.    The failure to grant promotion to Dr. Nelatury constitutes an adverse employment action.

140.    Dr. Ford, a full Professor, is a white native born American with lesser credentials than Dr. Nelatury and has discriminated against Dr. Nelatury in the past.

141.    Dr. Ford has blocked Dr. Nelatury's promotion to full Professor.

142.    In addition, Dr. Ford's review letters, his failure to recommend Dr. Nelatury for promotion, and the failure of the University-wide Committee to review Dr. Nelatury's application for promotion all constitute adverse employment actions.

143.    Dr. Nelatury has over 38 years of teaching experience and has been recognized for his accomplishments.

144.    The denial of promotion has had a significant negative impact on Dr. Nelatury's health and well-being.

145.    Significantly younger faculty, and/or faculty who were white, non-Indian, and/or of U.S. national origin, were not subject to similar treatment.

146.    Moreover, by failing to promote and/or recommend for promotion Dr. Nelatury, Penn State and Dr. Ford have retaliated against Dr. Nelatury for filing both an internal grievance and an administrative complaint against Dr. Ford, as well as his initial Title VII complaint.

147.    By retaliating against Dr. Nelatury for filing internal and external complaints, Penn State and Dr. Ford have retaliated against him for engaging in actions protected by Title VII.

148.    Dr. Nelatury was subjected to adverse employment action on account of his age, race, national origin, and gender.

149.    Dr. Nelatury was subjected to adverse employment action because he had engaged

in activities protected by Title VII.

150.   Penn State has created an ethnic and racial glass ceiling that Dr. Nelatury cannot penetrate despite his excellence.

151.   Dr. Nelatury demands a jury trial.

## VI.  COUNTS

### COUNT I: VIOLATION OF FREE SPEECH (RETALIATION)
### VIOLATIONS OF 42 U.S.C. § 1983
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

152.   The preceding paragraphs are incorporated as if set forth at length herein.

153.   Penn State is a state actor that acted under the color of law to deny Dr. Nelatury his protected rights to free speech.

154.   Academic and/or scholarly speech is protected by the First Amendment.

155.   Spurred on by global trends in favor of massive open access to research and scholarship and open online educational platforms (which includes, but is not limited to, Penn State's endorsement of open access publication), Dr. Nelatury engaged in open access scholarship.

156.   While University policy encourages open access publication, it did not require open access publication and Dr. Nelatury made an informed and independent decision to publish in open access fora.

157.   Dr. Nelatury's motives in publishing through open access fora was to make his scholarship available more widely to the general public.

158.   Even though University policy specifically indicates that "open access" work must be afforded the same status as peer-reviewed works that are published in traditional fora, Dr. Kurzweg and Dr. Ford unilaterally discounted Dr. Nelatury's open access output, implying that open

access publications would publish any author.

159.     In so doing Drs. Kurzweg and Ford ignored Dr. Nelatury's impressive record of 106 traditional format peer-reviewed publications.

160.     Dr. Nelatury's open access work was not afforded the value that it merited in light of global trends in favor of open access scholarship.

161.     Moreover, by punishing Dr. Nelatury for publishing in open access fora, Drs. Ford and Kurzweg punished him for making his work more available to the general public.

162.     Dr. Nelatury's academic work, which is in engineering, is a matter of interest to the general public.

163.     Academic freedom is an issue of interest to the general public.

164.     The failure to treat open access work the same as traditionally-published work is an unlawful regulation of speech.

165.     The summary failure to consider Dr. Nelatury's publication record of 106 traditional format publications also constitutes an illegal regulation of speech.

166.     Dr. Nelatury was denied promotion because he had published open access publications.

167.     The denial of Dr. Nelatury's promotion constitutes illegal discrimination and regulation of his publication record.

168.     Dr. Nelatury seeks all remedies and damages permitted under 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT II: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN
VIOLATION OF 42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983
Plaintiff Sudarshan Nelatury v. All Defendants**

169.    The preceding paragraphs are incorporated as if set forth at length herein.

170.    42 U.S.C. § 1981 ensures the equal right of all individuals to make and enforce contracts regardless of race.  Plaintiff brings this Section 1981 claim through 42 U.S.C. § 1983. Defendants acted under the color of state law.

171.    Dr. Nelatury is of Indian descent and national origin, and as such is a member of a class protected by 42 U.S.C. § 1981.

172.    Dr. Nelatury is an individual of Indian national origin, a person of color, and of non-U.S. national origin.

173.    Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

174.    Dr. Nelatury was qualified for promotion at Penn State.

175.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

176.    Dr. Nelatury was subjected to adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

177.    Dr. Nelatury's publication record is stronger than that of white faculty members of U.S. national origin who were promoted in the past.

178.    For instance, since 2016, Dr. Nelatury's academic publications have been cited a total of 1,873 times.

179.    In contrast, publications authored by Dr. Ford, a white faculty member of U.S. national origin, have been cited only 179 times since 2016.

180.    In addition, according to the "Research Gate" website, Dr. Nelatury's papers have received a total of 86,805 reads while Dr. Ford's papers have received only a total of 9,372 reads.

181.    Dr. Nelatury's score on Research Gate is 26.46 while Dr. Ford's score is 13.75.

182.    Dr. Nelatury was also given teaching assignments that artificially depressed his SRTE score while non-Indian faculty were not assigned similar responsibilities.

183.    A non-Indian faculty member was promoted by Dr. Ford ahead of Dr. Nelatury, notwithstanding the fact that she had a lesser publication record and the fact that the college-level promotion committee advised that Dr. Nelatury be promoted ahead of her.

184.    The Electrical Engineering Program at Penn State–Behrend only has three full Professors, all of whom are white males; in contrast, the electrical engineering department at Penn State's campus in Harrisburg has six full professors, two Associate Professors, and is more diverse.

185.    Two of the three members of the Electrical Engineering Program faculty hold administrative positions and do not teach; therefore, there is only one full Professor, Dr. Hemminger, who teaches.

186.    Dr. Nelatury has the best research record compared to the three full Professors but has not yet been promoted.

187.    Moreover, while Dr. Nelatury has published multiple books, neither Dr. Hemminger nor Dr. Wu, both of whom were promoted ahead of Dr. Nelatury, authored any books.

188.    Dr. Nelatury was treated less favorably than white colleagues of U.S. national origin.

189.    Dr. Nelatury was not evaluated consistent with University regulations holding that

promotions should be made on the basis of "relative merit."

190.    Dr. Nelatury was treated less favorably on account of his race, color, and national origin.

191.    Dr. Nelatury seeks all remedies and damages permitted under 42 U.S.C. § 1981 through 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and prejudgment and post-judgment interest.

### COUNT III: RETALIATION
### VIOLATION OF 42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983
### Plaintiff Sudarshan Nelatury v. All Defendants

192.    The preceding paragraphs are incorporated as if set forth at length herein.

193.    42 U.S.C. § 1981 ensures the equal right of all individuals to make and enforce contracts regardless of race.  Plaintiff brings this Section 1981 claim through 42 U.S.C. § 1983. Defendants acted under the color of state law.

194.    Individuals who complain of racial discrimination are protected from adverse employment action by 42 U.S.C. § 1981.

195.    Dr. Nelatury engaged in activity protected by 42 U.S.C. § 1981 when he complained of the fact that he was subjected to racially discriminatory treatment.

196.    The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

197.    Dr. Nelatury further engaged in activity protected by 42 U.S.C. § 1981 when he complained that his application for promotion was not being processed in accordance with internal University procedure.

198.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

199.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

200.    The discriminatory treatment of Dr. Nelatury remains ongoing.

201.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

202.    Dr. Nelatury was subjected to adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

203.    Dr. Nelatury was treated less favorably because he had complained of racially discriminatory practices at Penn State.

204.    Dr. Nelatury seeks all remedies and damages permitted under 42 U.S.C. § 1981 through 42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT IV: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e et seq.**
**Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University**

205.    The preceding paragraphs are incorporated as if set forth at length herein.

206.    Dr. Nelatury is of Indian descent and national origin, and as such is a member of a class protected by Title VII.

22

207.    Dr. Nelatury is an individual of Indian national origin, a person of color, and of non-U.S. national origin.

208.    Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

209.    Dr. Nelatury was qualified for promotion at Penn State.

210.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

211.    Dr. Nelatury was subjected to adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

212.    Dr. Nelatury's publication record is stronger than that of white faculty members of U.S. national origin who were promoted in the past.

213.    For instance, since 2016, Dr. Nelatury's academic publications have been cited a total of 1,873 times.

214.    In contrast, publications authored by Dr. Ford, a white faculty member of U.S. national origin, have only been cited 179 times since 2016.

215.    Dr. Nelatury was also given teaching assignments that artificially depressed his SRTE score while non-Indian faculty were not assigned similar responsibilities.

216.    A non-Indian faculty member was promoted by Dr. Ford ahead of Dr. Nelatury, notwithstanding the fact that she had a lesser publication record and the fact that the college-level promotion committee advised that Dr. Nelatury be promoted ahead of her.

217.    The Electrical Engineering Program at Penn State–Behrend only has three full

Professors, all of whom are white males; in contrast, the electrical engineering department at Penn State's campus in Harrisburg has six full professors, two Associate Professors, and is more diverse.

218.    Two of the three members of the Electrical Engineering Program faculty hold administrative positions and do not teach; therefore, there is only one full Professor, Dr. Hemminger, who teaches.

219.    Dr. Nelatury has the best research record compared to the three full Professors but has not yet been promoted.

220.    Dr. Nelatury was treated less favorably than white colleagues of U.S. national origin.

221.    Dr. Nelatury was not evaluated consistent with University regulations holding that promotions should be made on the basis of "relative merit."

222.    Dr. Nelatury was treated less favorably on account of his race, color, and national origin.

223.    Dr. Nelatury seeks all remedies and damages permitted under Title VII, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and prejudgment and post-judgment interest.

### COUNT V: RETALIATION
### VIOLATION OF TITLE VII, 42 U.S.C. § 2000e et seq.
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

224.    The preceding paragraphs are incorporated as if set forth at length herein.

225.    Individuals who complain of racial discrimination are protected from adverse employment action by Title VII.

226.    Dr. Nelatury engaged in activity protected by Title VII when he complained of the fact that he was subjected to racially discriminatory treatment.

227.    The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

228.    Dr. Nelatury further engaged in activity protected by Title VII when he complained that his application for promotion was not being processed in accordance with internal University procedure.

229.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

230.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to  recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

231.    The discriminatory treatment of Dr. Nelatury remains ongoing.

232.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

233.    Dr. Nelatury was subjected to adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

234.    Dr. Nelatury was treated less favorably because he had complained of racially discriminatory practices at Penn State.

235.    Dr. Nelatury seeks all remedies and damages permitted under Title VII, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT VI: DISCRIMINATION ON THE BASIS OF AGE
## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 621 et seq.
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

236.    The preceding paragraphs are incorporated as if set forth at length herein.

237.    Dr. Nelatury is over forty years of age and, as such, is a member of a class protected by the Age Discrimination in Employment Act ("ADEA").

238.    Dr. Nelatury was qualified for promotion at Penn State.

239.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

240.    The discriminatory treatment of Dr. Nelatury remains ongoing.

241.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

242.    Dr. Nelatury's publication record is stronger than that of younger faculty members who were promoted in the past.

243.    A significantly younger faculty member was promoted ahead of Dr. Nelatury despite having a lesser publication record.

244.    Dr. Nelatury was treated less favorably than his significantly younger colleagues.

245.    Dr. Nelatury was treated less favorably on account of his age.

246.    Dr. Nelatury seeks all remedies and damages permitted under the ADEA, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT VII: RETALIATION**
**VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C §**
**621 et seq.**
**Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University**

247. The preceding paragraphs are incorporated as if set forth at length herein.

248. Individuals who complain of age discrimination are protected from adverse employment action by the ADEA.

249. Dr. Nelatury engaged in activity protected by the ADEA when he complained of the fact that he was subjected to ageist discriminatory treatment.

250. The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

251. Dr. Nelatury further engaged in activity protected by the ADEA when he complained that his application for promotion was not being processed in accordance with internal University procedure.

252. Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

253. Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

254. The discriminatory treatment of Dr. Nelatury remains ongoing.

255. Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

256.     Dr. Nelatury was subjected to an adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

257.     Dr. Nelatury was treated less favorably because he had complained of ageist discriminatory practices at Penn State.

258.     Dr. Nelatury seeks all remedies and damages permitted under the ADEA including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT VIII: DISCRIMINATION ON THE BASIS OF SEX
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681 et seq.
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

259.     The preceding paragraphs are incorporated as if set forth at length herein.

260.     Title IX prohibits federally-funded educational institutions from discriminating on the basis of sex.

261.     Penn State is a federally funded educational institution.

262.     Dr. Nelatury is a male and, as such, is a member of a class protected by Title IX.

263.     Dr. Nelatury was qualified for promotion at Penn State.

264.     Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

265.     Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

266.     The discriminatory treatment of Dr. Nelatury remains ongoing.

267.     Dr. Nelatury was subjected to an adverse employment action in that he was not

promoted in academic rank from Associate Professor to full Professor.

268. Dr. Nelatury's publication record is stronger than that of a female faculty member who had a promotion review in the same academic year as Dr. Nelatury; this faculty member was promoted ahead of Dr. Nelatury.

269. Dr. Nelatury was treated less favorably than his significantly younger colleagues.

270. Dr. Nelatury was treated less favorably on account of his sex.

271. Dr. Nelatury complained of the discriminatory treatment to Penn State administrators who could have rectified the situation.

272. Dr. Nelatury seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT IX: RETALIATION
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681 et seq.
**Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University**

273. The preceding paragraphs are incorporated as if set forth at length herein.

274. Title IX prohibits federally-funded educational institutions from taking retaliatory actions against employees or students who complain of sex discrimination.

275. Penn State is a federally funded educational institution.

276. Title IX protects individuals who complain of sex discrimination from adverse employment action.

277. Dr. Nelatury engaged in activity protected by Title IX when he complained of the fact that he was subjected to sexist discriminatory treatment.

278. The aforementioned complaints include both Dr. Nelatury's internal grievance and

his administrative complaint/charge filed with the EEOC.

279.    Dr. Nelatury further engaged in activity protected by Title IX when he complained that his application for promotion was not being processed in accordance with internal University procedure.

280.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

281.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

282.    The discriminatory treatment of Dr. Nelatury remains ongoing.

283.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

284.    Dr. Nelatury was subjected to an adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

285.    Dr. Nelatury was treated less favorably because he had complained of sexist discriminatory practices at Penn State.

286.    Dr. Nelatury seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT X: DISCRIMINATION ON THE BASIS OF SEX
### VIOLATION OF TITLE VII, 42 U.S.C. § 2000e et seq.
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

287.    The preceding paragraphs are incorporated as if set forth at length herein.

288.    Dr. Nelatury is a male and, as such, is a member of a class protected by Title VII.

289.    Dr. Nelatury was qualified for promotion at Penn State.

290.    Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

291.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

292.    The discriminatory treatment of Dr. Nelatury remains ongoing.

293.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

294.    Dr. Nelatury's publication record is stronger than that of a female faculty member who had a promotion review in the same academic year as Dr. Nelatury; this faculty member was promoted ahead of Dr. Nelatury.

295.    Dr. Nelatury was treated less favorably than his significantly younger colleagues.

296.    Dr. Nelatury was treated less favorably on account of his sex.

297.    Dr. Nelatury seeks all remedies and damages permitted under Title VII, including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT XI: RETALIATION**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e et seq.**
**Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University**

298.    The preceding paragraphs are incorporated as if set forth at length herein.

299.    Title VII protects individuals who complain of sex discrimination from adverse employment action.

300.    Dr. Nelatury engaged in activity protected by Title VII when he complained of the fact that he was subjected to sexist discriminatory treatment.

301.    The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

302.    Dr. Nelatury further engaged in activity protected by Title VII when he complained that his application for promotion was not being processed in accordance with internal University procedure.

303.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

304.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

305.    The discriminatory treatment of Dr. Nelatury remains ongoing.

306.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

307.    Dr. Nelatury was subjected to an adverse employment action on account of the fact

that he had complained of racially discriminatory practices at Penn State.

308.    Dr. Nelatury was treated less favorably because he had complained of sexist discriminatory practices at Penn State.

309.    Dr. Nelatury seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT XII: BREACH OF CONTRACT
## VIOLATION OF PENNSYLVANIA COMMON LAW
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

310.    The preceding paragraphs are incorporated as if set forth at length herein.

311.    In order to state a claim for breach of contract under Pennsylvania law, a plaintiff must first plead the existence of a contract (including its essential terms), a breach of the contract on the part of the defendant, and resultant damages.

312.    Under Pennsylvania law, an internal employee handbook and/or employer policies may give rise to a binding contract between an employer and an employee.

313.    At Penn State, the process for promotion in academic rank is governed by a series of internal procedures that have been approved by the faculty and administration.

314.    These policies were disseminated throughout the faculty, and both PSU administrators and faculty understood that they governed faculty promotion.

315.    The central university policy governing tenure and promotion is University Policy AC23 Promotion and Tenure Procedures and Regulations.

316.    Per University Policy AC61 Faculty Contracts the aforementioned policy was incorporated into the general employment contract between full-time faculty and the University.

317.    This policy stresses that considerations of academic freedom are paramount in any

tenure decision: "Tenure is the keystone for academic freedom; safeguarding the right of free

expression and risk-taking inquiry is the basis for tenure.  Both tenure and academic freedom are

bound to an implicit social compact which recognizes that their maintenance serves important public

purposes and provides great benefits to society; the ultimate justification for tenure rests on the

bedrock of its social utility.  Additionally, a well-designed tenure and promotion system attracts

capable and highly qualified individuals as faculty members, strengthens institutional stability by

enhancing faculty members' institutional loyalty, and encourages academic excellence by retaining

and rewarding the most able people."  Exhibit A at 2.

318.    The policy further indicates that "[w]ith regard to promotion, decisions to promote

should be based on performance and scholarly achievement in the light of the general criteria."

Exhibit A at 10.

319.    Finally, the policy states that "[p]rior to appointment, all faculty members should be

informed by the appropriate officer of the University's policies and the procedures concerning

promotion and tenure and, at least annually, as to the faculty member's responsibility to teaching,

research and/or scholarly activity."  Exhibit A at 13.

320.    These internal procedures are uniformly applicable to all faculty members throughout

the Penn State system.

321.    A promotion in academic rank would have led to an increase in salary

322.    During the 2018-19 academic year, Dr. Nelatury prepared his promotion dossier in

accordance with the aforementioned procedures.

323.    Dr. Nelatury also relied on the aforementioned procedures when he requested that

34

Drs. Pinto, Hemminger, and Parente be named to the initial ad hoc review committee.

324.    However, Dr. Ford–acting within the scope of his employment as a Penn State administrator–rejected the three pre-approved members of the ad hoc committee and appointed his own committee members.

325.    Dr. Ford also did not allow Dr. Nelatury to supplement his promotion dossier.

326.    Dr. Ford's review of Dr. Nelatury's promotion dossier was contrary to Penn State's procedures regarding promotion.

327.    Upon review of his petition, the FRRC found that Dr. Ford's review of Dr. Nelatury's promotion application violated Penn State policy, and allowed for Dr. Nelatury to resubmit his employment application.

328.    The findings of the FRRC indicate that Penn State–acting through Dr. Ford, its agent–had breached the contract with Dr. Nelatury as set forth in its internal promotion procedures.

329.    Even though he was allowed to resubmit his application for promotion, the fact that he was not promoted during the 2018-19 academic year led to Dr. Nelatury suffering economic damages in the form of a deferred/lost increase in salary.

330.    Dr. Nelatury seeks all damages available under Pennsylvania law for breach of contract.

### COUNT XIII BREACH OF CONTRACT
### VIOLATION OF PENNSYLVANIA COMMON LAW
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

331.    The preceding paragraphs are incorporated as if set forth at length herein.

332.    In order to state a claim for breach of contract under Pennsylvania law, a plaintiff must first plead the existence of a contract (including its essential terms), a breach of the contract

on the part of the defendant, and resultant damages.

333.    Under Pennsylvania law, an internal employee handbook and/or employer policies may give rise to a binding contract between an employer and an employee.

334.    At Penn State, the process for promotion in academic rank is governed by a series of internal procedures that have been approved by the faculty and administration.

335.    These policies were disseminated throughout the faculty, and both PSU administrators and faculty understood that they governed faculty promotion.

336.    The central university policy governing tenure and promotion is University Policy AC23 Promotion and Tenure Procedures and Regulations.

337.    Per University Policy AC61 Faculty Contracts the aforementioned policy was incorporated into the general employment contract between full-time faculty and the University.

338.    This policy stresses that considerations of academic freedom are paramount in any tenure decision: "Tenure is the keystone for academic freedom; safeguarding the right of free expression and risk-taking inquiry is the basis for tenure.  Both tenure and academic freedom are bound to an implicit social compact which recognizes that their maintenance serves important public purposes and provides great benefits to society; the ultimate justification for tenure rests on the bedrock of its social utility.  Additionally, a well-designed tenure and promotion system attracts capable and highly qualified individuals as faculty members, strengthens institutional stability by enhancing faculty members' institutional loyalty, and encourages academic excellence by retaining and rewarding the most able people."  Exhibit A at 2.

339.    The policy further indicates that "[w]ith regard to promotion, decisions to promote should be based on performance and scholarly achievement in the light of the general criteria."

Exhibit A at 10.

340.    Finally, the policy states that "[p]rior to appointment, all faculty members should be informed by the appropriate officer of the University's policies and the procedures concerning promotion and tenure and, at least annually, as to the faculty member's responsibility to teaching, research and/or scholarly activity."  Exhibit A at 13.

341.    Numerous times Dr. Nelatury received SRTEs greater than 6.0 on a scale of 7.0; for instance, in Fall 2019 his scores in three courses were 6.62, 6.54, 6.4 out of 7.

342.    In rare instances he received lower scores in low-level courses (which were team-taught courses), but faulting teaching based on these outliers to the total exclusion of his exemplary high numbers shows pretext.

343.    Dr. Nelatury had asked Dr. Hemminger to reassign a lower level course to a non-Indian faculty member Dr. Hemminger but did not do so for the purpose of bolstering that individual's SRTE scores.

344.    Per University policy, SRTE must be viewed along with peer-reviews of faculty members for promotion and tenure.

345.    Contrary to University policy, Dr. Ford and Dr. Kurzweg failed to inform Dr. Nelatury of how the SRTEs would factor into any promotion decision.

346.    Dr. Nelatury had been ranked as "excellent" in his peer-review report.

347.    Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

348.    Dr. Ford also failed to adhere to University policy or to the spirit of University policy when he failed to explain the SRTE policy to Dr. Nelatury.

349.     The failures of Dr. Ford and Dr. Kurzweg to adhere to university policy led to Dr. Nelatury being denied promotion.

350.     The fact that he was not promoted led to Dr. Nelatury being denied an increase in salary; this, in turn, led to him suffering economic damages.

351.     Dr. Nelatury seeks all damages available under Pennsylvania law for breach of contract.

**COUNT XIV: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 42 P.S. § 951 et seq.**
**Plaintiff Sudarshan Nelatury v. All Defendants**

352.     The preceding paragraphs are incorporated as if set forth at length herein.

353.     Dr. Nelatury is of Indian descent and national origin, and as such is a member of a class protected by the PHRA.

354.     Dr. Ford is a managerial employee/supervisor who aided and abetted any discriminatory action against Dr. Nelatury.

355.     Dr. Nelatury is an individual of Indian national origin, a person of color, and of non-U.S. national origin.

356.     Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

357.     Dr. Nelatury was qualified for promotion at Penn State.

358.     Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

359. Dr. Nelatury was subjected to adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

360. Dr. Nelatury's publication record is stronger than that of white faculty members of U.S. national origin who were promoted in the past.

361. For instance, since 2016, Dr. Nelatury's academic publications have been cited a total of 1,873 times.

362. In contrast, publications authored by Dr. Ford, a white faculty member of U.S. national origin, have only been cited 179 times since 2016.

363. Dr. Nelatury was also given teaching assignments that artificially depressed his SRTE score while non-Indian faculty were not assigned similar responsibilities.

364. A non-Indian faculty member was promoted by Dr. Ford ahead of Dr. Nelatury, notwithstanding the fact that she had a lesser publication record and the fact that the college-level promotion committee advised that Dr. Nelatury be promoted ahead of her.

365. The Electrical Engineering Program at Penn State–Behrend only has three full Professors, all of whom are white males; in contrast, the electrical engineering department at Penn State's campus in Harrisburg has six full professors, two Associate Professors, and is more diverse.

366. Two of the three members of the Electrical Engineering Program faculty hold administrative positions and do not teach; therefore, there is only one full Professor, Dr. Hemminger, who teaches.

367. Dr. Nelatury has the best research record compared to the three full Professors but has not yet been promoted.

368. Dr. Nelatury was treated less favorably than white colleagues of U.S. national origin.

369.     Dr. Nelatury was not evaluated consistent with University regulations holding that promotions should be made on the basis of "relative merit."

370.     Dr. Nelatury was treated less favorably on account of his race, color, and national origin.

371.     Dr. Nelatury seeks all remedies and damages permitted under the PHRA including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and prejudgment and post-judgment interest.

### COUNT XV: DISCRIMINATION ON THE BASIS OF AGE
### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 951 et seq.
### Plaintiff Sudarshan Nelatury v. All Defendants

372.     The preceding paragraphs are incorporated as if set forth at length herein.

373.     Dr. Nelatury is over forty years of age and, as such, is a member of a class protected by the PHRA.

374.     Dr. Ford is a managerial employee/supervisor who aided and abetted any discriminatory action against Dr. Nelatury.

375.     Dr. Nelatury was qualified for promotion at Penn State.

376.     Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

377.     The discriminatory treatment of Dr. Nelatury remains ongoing.

378.     Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

379.    Dr. Nelatury's publication record is stronger than that of younger faculty members who were promoted in the past.

380.    A significantly younger faculty member was promoted ahead of Dr. Nelatury despite having a lesser publication record.

381.    Dr. Nelatury was treated less favorably than his significantly younger colleagues.

382.    Dr. Nelatury was treated less favorably on account of his age.

383.    Dr. Nelatury seeks all remedies and damages permitted under the PHRA, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT XVI: RETALIATION
### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 951 et seq.
### Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University

384.    The preceding paragraphs are incorporated as if set forth at length herein.

385.    Individuals who complain of age discrimination are protected from adverse employment action by the ADEA.

386.    Dr. Nelatury engaged in activity protected by the ADEA when he complained of the fact that he was subjected to ageist discriminatory treatment.

387.    Dr. Ford is a managerial employee/supervisor who aided and abetted any retaliatory action against Dr. Nelatury.

388.    The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

389.    Dr. Nelatury further engaged in activity protected by the ADEA when he complained

that his application for promotion was not being processed in accordance with internal University procedure.

390.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

391.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

392.    The discriminatory treatment of Dr. Nelatury remains ongoing.

393.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

394.    Dr. Nelatury was subjected to an adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

395.    Dr. Nelatury was treated less favorably because he had complained of ageist discriminatory practices at Penn State.

396.    Dr. Nelatury seeks all remedies and damages permitted under the PHRA including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT XVII: DISCRIMINATION ON THE BASIS OF SEX**
**VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 951 et**
**seq.**
**Plaintiff Sudarshan Nelatury v. Defendant Pennsylvania State University**

397.    The preceding paragraphs are incorporated as if set forth at length herein.

42

398.    Dr. Nelatury is a male and, as such, is a member of a class protected by the PHRA.

399.    Dr. Ford is a managerial employee/supervisor who aided and abetted any discriminatory action against Dr. Nelatury.

400.    Dr. Nelatury was qualified for promotion at Penn State.

401.    Dr. Nelatury was assigned to immigration classifications(s) reserved for highly skilled individuals.

402.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

403.    The discriminatory treatment of Dr. Nelatury remains ongoing.

404.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

405.    Dr. Nelatury's publication record is stronger than that of a female faculty member who had a promotion review in the same academic year as Dr. Nelatury; this faculty member was promoted ahead of Dr. Nelatury.

406.    Dr. Nelatury was treated less favorably than his significantly younger colleagues.

407.    Dr. Nelatury was treated less favorably on account of his sex.

408.    Dr. Nelatury seeks all remedies and damages permitted under the PHRA, including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT XVIII: RETALIATION
## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 951 et seq.
### Plaintiff Sudarshan Nelatury v. All Defendants

409.    The preceding paragraphs are incorporated as if set forth at length herein.

410.    The PHRA protects individuals who complain of sex discrimination from adverse employment action.

411.    Dr. Nelatury engaged in activity protected by the PHRA when he complained of the fact that he was subjected to sexist discriminatory treatment.

412.    Dr. Ford is a managerial employee/supervisor who aided and abetted any discriminatory action against Dr. Nelatury.

413.    The aforementioned complaints include both Dr. Nelatury's internal grievance and his administrative complaint/charge filed with the EEOC.

414.    Dr. Nelatury further engaged in activity protected by the PHRA when he complained that his application for promotion was not being processed in accordance with internal University procedure.

415.    Dr. Nelatury was subjected to an adverse employment action in that his promotion application was not processed in a manner consistent with University regulations and in that his promotion dossier was not evaluated fairly.

416.    Dr. Nelatury was subjected to further adverse employment action in February 2021 when Dr. Ford failed to recommend Dr. Nelatury for promotion and when his dossier was not forwarded to the University-wide Committee for review.

417.    The discriminatory treatment of Dr. Nelatury remains ongoing.

418.    Dr. Nelatury was subjected to an adverse employment action in that he was not promoted in academic rank from Associate Professor to full Professor.

419.    Dr. Nelatury was subjected to an adverse employment action on account of the fact that he had complained of racially discriminatory practices at Penn State.

420.    Dr. Nelatury was treated less favorably because he had complained of sexist discriminatory practices at Penn State.

421.    Dr. Nelatury seeks all remedies and damages permitted under the PHRA including, but not limited to, back pay, front pay, emotional distress, medical harm, and reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
Jacob M. Simon
Pa. I.D. No. 202610
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2022, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which shall serve notice upon the following:

Stephanie R. Reiss, Esq.
Morgan Lewis & Bockius, LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219-6401

Sarah E. Bouchard, Esq.
Jack Hensler, Esq.
Morgan Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921

Ami Wynne, Esq.
Morgan Lewis & Bockius, LLP
110 North Wacker Drive
Chicago, IL 60606

Counsel for Defendants

s/James B. Lieber
James B. Lieber
Counsel for Plaintiff