**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SUDARSHAN NELATURY,         )
                      Plaintiff,      )
                                )
     v.                     )
                                )     Civil Action No. 1:21-cv-279
THE PENNSYLVANIA STATE     )
UNIVERSITY, RALPH FORD,     )
                 Defendants.

**MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE**

This case involves claims of discrimination, retaliation, and breach of contract brought by Plaintiff Dr. Sudarshan Nelatury, an associate professor who was denied promotion to full professor. Defendants are The Pennsylvania State University and Dr. Ralph Ford, Chancellor of The Behrend College. Before the Court is Defendants' Motion for Summary Judgment, Dkt. 70, and Motion to Strike, Dkt. 114. For the reasons stated below, the motion for summary judgment is GRANTED in full and the motion to strike is DENIED as moot.

**I.    Factual Background**

Dr. Nelatury is a tenured associate professor in the Computer and Electrical Engineering Department of the School of Engineering at The Behrend College, which is Penn State's Erie campus. Dkt. 134 ¶¶ 1–2. He is male, from India, is Asian, and was 61 years old in 2021. *Id.* at ¶ 2. He was hired as an associate professor in 2003 and promoted to his current role in 2009. Dkt. 73-1 at 3, 5. In 2018, Dr. Nelatury sought promotion to full professor. Dkt. 73-19 at 7.

A.    **Promotion Policies and Process**

Penn State's promotion and tenure decisions are based on the academic judgments of peer faculty and academic administrators. Dkt. 73-4 at 4. The evaluation of candidates like Dr. Nelatury is governed by policies applicable to the Penn State University system, Penn State Behrend, and the School of Engineering. Dkt. 73-5; Dkt. 73-6; Dkt. 73-7. An associate professor seeking promotion to full professor is evaluated in three areas. Dkt. 73-6 at 2.

*Teaching and Learning.* To be promoted, an associate professor must demonstrate a consistent ability to teach and communicate technical knowledge to students. *Id.* Reviewers consider peer reviews; evaluations from former students and alumni; recognition for teaching excellence; student reviews of teaching effectiveness (SRTEs), which rate teaching and course effectiveness on a scale from 1 to 7; and other relevant information. Dkt. 73-6 at 2–3.

*Research and Creative Accomplishments.* To be promoted to full professor, the individual must possess an extensive and outstanding research record since promotion to associate professor and must be a nationally-recognized expert in a particular area of research. Dkt. 73-6 at 4. Candidates must present clear evidence of sustained accomplishments of high-quality research activities. *Id.* Reviewers primarily consider published articles in peer-reviewed journals, books, or conference proceedings; grant awards above $50,000; patents; and transfer of technology to industry. *Id.* at 3. Reviewers also consider published articles in journals, books, or conference proceedings with no peer review process. Dkt. 73-6 at 4–5.

*Service to the University, Society, and the Profession.* The associate professor must participate in professional or administrative activities. Dkt. 73-6 at 5. Reviewers consider evidence of administrative work and contributions to community affairs, government, industry, and public and private organizations. *Id.* Candidates must also demonstrate leadership and significant professional contributions in these areas. *Id.*

The school in which the candidate teaches has the primary responsibility of preparing a dossier for evaluation that aggregates information including the candidate's statement, letters of assessment from external reviewers (i.e., faculty at other universities), and metrics applicable to each of the three areas of evaluation. Dkt. 73-7 at 3–7; Dkt. 73-4 at 5.

Once the dossier is ready, a candidate typically requests that the director of his or her school put together an "ad hoc" committee of full professors to evaluate whether the candidate is likely to be promoted. Dkt. 73-19 at 6. The candidate can choose to go forward with the official promotion process even if the committee believes promotion is not likely. Dkt. 73-1 at 24.

There are four levels of review in the promotion process for an associate professor in the School of Engineering. First, a committee of tenured faculty members in the School reviews the dossier and recommends promoting, or not promoting, the candidate. Dkt. 73-1 at 8. The second level of review and recommendation is the Director of the School of Engineering. *Id.* If neither the School Committee nor the Director recommends promotion, the candidate is informed so that he or she can decide whether to withdraw from the process. Dkt. 73-7 at 8. If the candidate decides to continue, the third level of review is by the Penn State Behrend College Committee. Dkt. 73-1 at 8. The fourth level of review is by the Chancellor of Penn State Behrend. *Id.*

As the candidate's dossier proceeds through each level of review, it incorporates the promotion memoranda from the preceding level(s) of review. Dkt. 73-24 at 6–7. Should the Chancellor recommend promotion, the candidate moves forward to the Penn State University-wide promotion evaluation process. Dkt. 73-4 at 9. If the first two levels of review are negative and the Chancellor's recommendation is also negative, the decision is final. *Id.*

**B.       Dr. Nelatury Applies for Promotion in 2018–19**

In Spring 2018, Dr. Nelatury discussed seeking promotion from associate to full professor with then-interim school director Edward Evans. Dkt. 73-19 at 7. With Dr. Nelatury's

permission, Evans put together an ad hoc committee of tenured professors: Jeff Pinto, Tom Hemminger, and Diane Parente. Dkt. 73-1 at 22-23. The ad hoc committee also reviewed two other candidates for nomination to full professor, including Dr. Yi "Elisa" Wu. Dkt. 73-19 at 8. The ad hoc committee told Evans their reviews were "mixed" on Dr. Nelatury and they did not think he had a clear path to promotion. Dkt. 73-19 at 12, 14–15. Dr. Nelatury received this feedback informally from Evans, including concerns about his SRTE scores. Dkt. 73-10 at 2–3. A few months after the ad hoc committee reviews, Dr. Timothy Kurzweg replaced Evans as Director of the School of Engineering. Dkt. 73-1 at 25–26. As part of the transition, Evans informed Dr. Kurzweg that Dr. Wu would have a good chance of promotion, but Dr. Nelatury's chances were less clear. Dkt. 73-19 at 16–17.

Despite receiving mixed feedback, Dr. Nelatury decided to move forward with a formal promotion process in the 2018–19 academic year. Dkt. 73-1 at 24.

### 1. Dr. Nelatury's Dossier

***Dr. Nelatury's Teaching and Learning.*** Dr. Nelatury's SRTE scores were inconsistent, and he had several lower scores. Dkt. 73-12 at 18–19. Many of his lower scores were from introductory and lower-division courses, *id.*, which were difficult to teach, Dkt. 88-5 at 8; Dkt. 91-10 at 26. A slight majority of students rated Dr. Nelatury in the top quartile of professors, but 35% of students ranked him in the bottom quartile. Dkt. 73-12 at 26. There were several negative comments that "he glossed over important topics," was "[v]ery hard to understand at times," and "would insult . . . students." *Id.* at 26–27. Positive comments said he was the "[s]martest professor I've ever had," "[v]ery good at what he does," and "an excellent professor." *Id.*

***Dr. Nelatury's Research and Creative Accomplishments***. Dr. Nelatury was a co-author on forty published articles, often with the same two co-authors. Dkt. 73-12 at 30–34. His research had trailed off—he did not have any conference papers, seminars, symposia, or

workshops after 2014. *Id.* at 30–40. He also was awarded only one small research grant, which was in 2004. *Id.* at 43. Three external reviewers recommended him for promotion. One found his research to be of "good or very good quality." *Id*. at 56. Another found his research quality in digital signal processing to be "acceptable." *Id.* at 61. The third found several articles between 2004 and 2014 to be impactful in their respective fields. However, this reviewer also was "concern[ed]" that recent papers were "simple commentaries" published in unfamiliar journals which could "dilute his actual scholarly contributions." *Id.* at 62–63. One reviewer did not recommend promotion and, among other negative comments, said his "articles don't seem to add up to a research focus and have no identifiable thread," there was a "disconcerting . . . suspension of scholarly work around 2014," and there was "minimal" grant activity. *Id.* at 58–59.

   ***Dr. Nelatury's Service to the University, Society, and the Profession.*** Dr. Nelatury served on many school, college, and university committees. Dkt. 73-12 at 47–48. He did administrative work and contributed to university programs to enhance equal opportunity and cultural diversity. *Id.* at 48. He also had a record of service to the engineering profession and was the Chair of the Institute of Electrical and Electronics Engineers (IEEE) Erie Section. *Id.* at 49.

   ## 2.  Review of Dr. Nelatury's Dossier

   The School Committee, the first level of review, was composed of three professors. Dkt. 73-12 at 65–67. For teaching, the Committee found his record to be "mixed." *Id.* at 65. The Committee was "very concerned about the high variability in his SRTE ratings and student comments" and concluded he was "effectively teaching the top students, but is not connecting well with almost half of them. This is a major weakness in the record." *Id.*

   For research, the Committee said the "sheer number of publications" was "impressive." *Id.* But it also noted the external reviews were "mixed," "there were no comments suggesting the

quality of work was outstanding," and one reviewer "was quite negative." *Id.* at 65–66. It also highlighted that the "quality of his work appears to have diminished after 2015." *Id.* at 66.

For service, the Committee said, "While the service record shows some activity, it is not particularly strong, and the lack of leadership within the University is a concern." *Id.*

Despite these concerns, the School Committee rated Dr. Nelatury "very good" in each of the three areas. *Id.* at 65–66. But, in summary, the Committee expressed its view that promotion "requires no major weaknesses and something outstanding in the candidate's record." *Id.* Dr. Nelatury did not fit that description because "there are aspects of both his teaching and research record that are a significant concern, and his service record is not very strong." *Id.* The Committee unanimously voted not to recommend promotion, believing "[t]his record is not of the type that is typically associated with those promoted to professor. *Id.* at 66–67.

Director Kurzweg was the second level of review and, after evaluating the dossier, did not recommend Dr. Nelatury for promotion. *Id.* at 69. He rated him "very good" in teaching and scholarship and "satisfactory" in service. *Id.* at 68–69. In support of his conclusions, Dr. Kurzweg pointed to many of the same strengths and weaknesses that the Committee found. *Id.*

Dr. Kurzweg told Dr. Nelatury he did not recommend him for promotion and Dr. Nelatury could choose to withdraw from the promotion process. Dkt. 91-10 at 46. Dr. Nelatury asked if he could add information to the dossier. *Id.* After seeking and receiving counsel on the promotion process from the Penn State Behrend associate dean for academics, Dr. Kurzweg informed Dr. Nelatury that it was not possible. *Id.* Even so, Dr. Nelatury chose to continue to the next level of review with the College Committee. Dkt. 73-1 at 46–47.

The College Committee, composed of three Behrend professors, recommended Dr. Nelatury for promotion but urged him to "develop a better teaching approach in his 100 and 200

level classes [and] a more focused research agenda, target higher quality journals for his research publications, and seek external funding." Dkt. 73-12 at 71.

The final level of review at Penn State Behrend was performed by Chancellor Ralph Ford. Dkt. 73-12 at 72. Dr. Ford did not recommend Dr. Nelatury for promotion. *Id.* He expressed many of the same concerns identified at the prior levels of review, such as inconsistent SRTE scores and a lack of research focus. *Id.* at 72–73.

With three levels of review not recommending him for promotion—and only the College committee in favor—Dr. Nelatury was not promoted. Dkt. 105-12 at 179–80.

**C.    Dr. Nelatury Petitions the Faculty Rights and Responsibilities ("FR&R") Committee and Files Employment Discrimination Charges**

In January 2020, Dr. Nelatury filed a petition with the FR&R Committee, complaining (among other things) that the School Committee that evaluated his dossier was improperly composed and he was wrongly denied the opportunity to supplement his dossier. Dkt. 73-1 at 50. In September, after an internal investigation, the FR&R Committee informed Dr. Nelatury that it did not find evidence of procedural errors in the creation of the School Committee but did find that Dr. Nelatury should have been permitted to supplement his dossier before February 15, 2019. Dkt. 73-14 at 2. The FR&R Committee concluded that Dr. Nelatury's application would be re-evaluated, and he would be permitted to update the dossier with new information that occurred before the February 15, 2019 deadline. *Id.*

Dr. Nelatury's petition also included a claim that the recommendations not to promote him were discriminatory based on his sex, race, national origin, and/or age. Dkt. 73-1 at 62–63; Dkt. 73-17 at 2. The claims were sent to Penn State's Affirmative Action Office, which investigated them and determined they were unsubstantiated. Dkt. 73-17 at 2. In November 2020, Dr. Nelatury filed administrative charges of employment discrimination against Penn State

and Dr. Ford with the Pennsylvania Human Rights Commission and the U.S. Equal Employment

Opportunity Commission (EEOC). Dkt. 38 at ¶¶ 6–7.

**D.      Dr. Nelatury's Promotion Application is Re-Evaluated in 2020–21**

The re-evaluation of Dr. Nelatury's application for promotion took place during the

2020–21 review cycle. Doc. 73-16. Dr. Nelatury added the following items to his dossier that

were not in his 2018–19 dossier: a professional journal article; two books under contract; six

chapters in textbooks; two academic journal articles; and one review. *Compare* Dkt. 73-12 at 30,

35, 36, 41–42 *with* Dkt. 73-16 at 31, 36–37, 41, 43.

The School Committee was composed of different professors from the 2018–19 cycle,

but included Professor Parente, who was originally on the ad hoc review committee. *Compare*

Dkt. 73-12 at 67 *with* Dkt. 73-16 at 69. It completed the first level of review and did not

recommend Dr. Nelatury for promotion. Dkt. 73-16 at 69. The committee rated his teaching as

satisfactory, noting no substantive improvement in SRTE scores since 2009 and relatively low

scores for introductory courses. Dkt. 16 at 66. The committee rated his scholarship as

satisfactory and noted a lack of research focus, minimal grant funding, and a drop-off in his

publication record since 2009. *Id.* at 67. The committed rated his service as satisfactory and

noted that he did not take on leadership roles. *Id.* at 67–68.

Dr. Kurzweg completed the second level of review and, as in 2018–19, declined to

recommend promotion. Dkt. 73-16 at 72. He noted many of same concerns he had during the

2018–19 review. *Id.* at 70–72. Dr. Nelatury decided to continue with the review process and his

dossier proceeded to the College Committee. Dkt. 73-1 at 58.

The College Committee, composed of different professors from the 2018–19 cycle,

completed the third-level review and recommended Dr. Nelatury for promotion. *Compare* Dkt.

73-16 at 74 *with* Dkt. 73-12 at 71. However, the 2020–21 Committee also acknowledged Dr.

Nelatury's inconsistent teaching performance in the introductory courses, a lack of focus in research, and the drop-off in his publication record. Dkt. 73-16 at 73–74.

At the fourth level of review, Dr. Ford did not recommend promotion. He noted similar strengths and weaknesses as he had during the 2018–19 review. Dkt. 73-16 at 75–76. Once again, the end result is that Dr. Nelatury was not promoted. Dkt. 105-12 at 221.

### E.    Dr. Nelatury's Comparators

Dr. Nelatury points to several other faculty members, who were promoted to full professor, as comparators.

***Dr. Elisa Wu*** was Chair of the Mechanical Engineering Department and was promoted to full professor in the 2018–19 academic year. Dkt. 73-21. Dr. Wu is Asian, Chinese, and female. Dkt. 74 ¶ 12. All four of her external reviewers recommended promotion, two of them "strongly." Dkt. 73-21 at 7–14. Dr. Wu's SRTE scores were consistently higher than Dr. Nelatury's. *Id.* at 3–4. And 85% percent of students ranked her in the top quartile of professors, while only 10% ranked her in the bottom quartile. *Id*. at 5.

The School Committee recommended Dr. Wu for promotion, noting that "her overall performance is very good with no significant weaknesses. She has shown commitment to her teaching, progressed in her research to develop a national reputation, and show[n] leadership at the college and school level." Dkt. 73-21 at 16.

Dr. Kurzweg recommended Dr. Wu for promotion, citing her consistently strong teaching scores and survey results. Dkt. 73-21 at 18–19. He also noted that she received a $300,000 research grant. Dkt. 73-21 at 18–19. He rated her service as "excellent" and said "she has been instrumental in the growth, success, and sustainability of the Mechanical Engineering program." *Id.* The College Committee did not recommend Dr. Wu for promotion, although it rated her very good in teaching and research and excellent in service. Dkt. 73-21 at 20–21.

Dr. Ford, at the fourth level of review, recommended Dr. Wu for promotion. *Id.* at 22–23. He noted her consistently high SRTE scores, strong student survey results, and support from external reviewers. *Id.* at 22. He pointed to her strong research record, including that most of her publications were in reputable journals and conference venues. *Id.* He also was impressed with Dr. Wu's service as chair of the "largest major in the college." *Id.* at 23.

**Dr. Chetan Nikhare**, another professor in the Behrend School of Engineering, was promoted to full professor in 2023. Dkt. 74 ¶ 9. Dr. Nikhare is Asian, male, and from India. *Id.* ¶¶ 9-10. The School Committee did not recommend promotion. Dkt. 73-25 at 3. However, the subsequent levels of review did: Dr. Kurzweg, the College Committee, and Dr. Ford. *Id.* at 6-7; Dkt. 73-25 at 9. The people and bodies recommending promotion evaluated Dr. Nikhare's research as excellent and noted he had secured a substantial amount of external funding, almost $1 million. Dkt. 73-25 at 5–9. Dr. Ford noted that he had "one patent and three pending." *Id.* at 9.

**Dr. Jun Zhou** was promoted to full Professor of Mechanical Engineering in 2019–20. Dkt. 73-23 at 2–10. Dr. Zhou is Asian and male. Dkt. 74 ¶ 11. Each level of review rated his teaching and research as excellent. Dkt. 73-23 at 2–10. The School Committee noted his SRTE scores were consistently strong and "19 out of 21 respondents rated Dr. Zhou in the top [quartile] with regard to teaching ability and 11 of those placed him in the top 10%." *Id.* at 3. All external reviewers recommended Dr. Zhou for promotion and described his research as "outstanding," "ground-breaking," "superb," and targeted. *Id.* at 3, 8. Each level noted his successful record of procuring funding and recommended promotion. Dkt. 73-23 at 2–10.

**Dr. Alicyn Rhoades.** Dr. Rhoades, a female, was promoted to full Professor of Engineering in 2022–23. Dkt. 74 at ¶ 13.[1] Every level of review at Behrend rated her as "excellent" in teaching, research, and service and recommended her promotion. Dkt. 73-22 at 2–9. All external reviewers recommended promotion as well. *Id.* at 3. Dr. Rhoades had consistently relatively high SRTE scores and almost all students surveyed rated her in the top quartile. *Id.* Each level of review also noted her multi-million-dollar grant awards. *Id.* at 3–9.

## II.    Procedural History

The original complaint was filed on October 11, 2021. Dkt. 1. The operative complaint is the Second Amended complaint, which was filed on October 13, 2022. Dkt. 38. Eighteen counts survived Defendants' motion to dismiss for failure to state a claim, falling into four categories.

A.  Discrimination on account of race, ethnicity, national origin, sex, and age in violation of Title VII, 42 U.S.C. § 2000e; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621; Title IX, 20 U.S.C. § 1681; 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 (Counts 2, 4, 6, 8, 10, 14, 15, and 17);

B.  Retaliation for complaining of discrimination in violation of Title VII, § 1981, Title IX, ADEA, and PHRA (Counts 3, 5, 7, 9, 11, 16, and 18);

C.  First Amendment retaliation under 42 U.S.C. § 1983 (Count 1); and

D.  Breach of contract under Pennsylvania law (Counts 12 and 13).

Dkt. 38 at ¶¶ 152–421. The parties conducted discovery and on February 9, 2024, Defendants filed a Motion for Summary Judgment on all claims, which is now before the Court. Dkt. 70. Dr. Nelatury opposed summary judgment on April 23, 2024. Dkt. 97. On July 22, 2024, Defendants filed a Reply. Dkt. 133. The Motion for Summary Judgment is ripe for disposition.

Also before the Court is Defendants' Motion to Strike portions of Dr. Nelatury's Counterstatement of Material Facts. Dkt. 114. Dr. Nelatury filed an opposition, Dkt. 117, but it

---

[1] There is no evidence of Dr. Rhoades' race. *See* Dkt. 74. The Court can infer she is female because of the pronouns "she" and "her" used in her dossier. *See* Dkt. 73-22.

was ten days late. The Court had already ruled that it would not grant any extension for an opposition, Dkt. 116, and Dr. Nelatury's opposition did not acknowledge the lateness or offer any argument why the opposition should nevertheless be considered. The Court therefore did not consider it. With leave, Defendants filed a reply in support of their motion. Dkt. 120. The Court ruled that it would hold the Motion to Strike in abeyance pending its ruling on the Motion for Summary Judgment. Dkt. 123. The Motion to Strike is now ripe for disposition.

For the reasons explained below, the Court concludes there is no genuine issue of material fact and grants Defendants' Motion for Summary Judgment in its entirety. The Court denies the Motion to Strike as moot.

## III.    Legal Standard

A district court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). The evidence is viewed in the light most favorable to the non-moving party and all reasonable inferences are drawn in his favor. *Id.* The Court is not "to weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Statements that are "unsworn and not given under the penalty of perjury" are, by themselves, "insufficient to create an issue of fact on summary judgment." *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019).

## IV.    Discussion

The parties agree that the burden-shifting analysis of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to all of Dr. Nelatury's discrimination claims: those under ADEA, Title VII, and the PHRA, *Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26, 432 (3d Cir. 2013); those under § 1981, *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); and those under Title IX, *Dennison v. Ind. Univ. of Pa.*, No. 22-2649, 2023 WL 8595426, at *6 (3d Cir. Dec. 12, 2023) (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). Under that framework, the plaintiff must first establish a prima facie case of discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).To make out a prima facie case, the plaintiff must show that (1) he is a member of a protected class (2) who was qualified for the position and (3) suffered adverse employment action (4) while members outside the protected class were treated more favorably, or circumstances generally permitted an inference of intentional discrimination. *Burton*, 707 F.3d at 425–26, 432.

The burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their action, though this burden is "relatively light." *Fuentes*, 32 F.3d at 763. The burden finally shifts back to the plaintiff to establish that the legitimate reason offered by the defendant is mere pretext. *Id.* The plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

In establishing pretext, the plaintiff may not "ignor[e] a significant group of comparators who were treated equally." *Simpson v. Kay Jewelers*, 142 F.3d 639, 642 (3d Cir. 1998). Nor is it sufficient that "members of one group are sometimes treated better and sometimes treated worse than members of another group." *Id.* at 646. The burden is on the plaintiff to show that the

employer's reasons for its actions contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) (citation omitted). The employer's reason must be not "merely . . . wrong, but . . . so plainly wrong that it cannot have been the . . . real reason." *Id.* (internal quotation marks and citation omitted).

## A. Discrimination claims

Third Circuit law circumscribes a court's review of claims of discrimination in academic settings. A court should not "substitute [its] judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 174 (3d Cir. 1991) (quoting *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 548 (3d Cir. 1980)) (*overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993)). This guiding principle is based on the understanding that "faculty employment decisions comprehend discretionary academic determinations which . . . entail review of the intellectual work product of the candidate." *Kunda*, 621 F.2d at 547. That judgment is most effectively rendered within the university, and faculty peer review "has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Id.* at 548 (quoting *Johnson v. Univ. of Pittsburgh*, 435 F. Supp. 1328, 1346 (W.D. Pa. 1977)).

For these reasons, "[t]he oft times difficult decision to promote or to grant tenure shall be left exclusively to this nation's colleges and universities"—but only "so long as the decisions are not made, in part large or small, upon statutorily impermissible reasons." *EEOC v. Franklin & Marshall Coll.*, 775 F.2d 110, 117 (3d Cir. 1985). While a court "do[es] not sit as a super tenure review board," it must "determine whether there exists that minimum quantum of evidence" that would allow a reasonable jury to "find[] that . . . race was a determinative factor" in evaluating a candidate. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 731 (3d Cir. 1988). There must be "more than

14

a . . . disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university." *Molthan v. Temple Univ. of Commw. Sys. of Higher Educ.*, 778 F.2d 955, 962 (3d Cir. 1985) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 94 (2d Cir. 1984)).

### 1. Age discrimination under ADEA and PHRA

Dr. Nelatury alleges he "was treated less favorably than his significantly younger colleagues . . . on account of his age." Dkt. 38 at 26, 40–41. However, there is no evidence of anyone's age except Dr. Nelatury's. Faculty dossiers do not contain birthdates. *See* Dkt. 73-16, 73-21, 73-23. A declaration by a Penn State Vice President provides the sexes and races of faculty members, but not ages. *See* Dkt. 74. And deposition witnesses declined to speculate about their colleagues' ages. *See, e.g.*, Dkt. 105-21 at 35. Without knowing the ages of Dr. Nelatury's comparators, a reasonable factfinder could not find that those outside the protected age class were treated more favorably. *See Burton*, 707 F.3d at 425–26, 432. Accordingly, Dr. Nelatury fails to make out a prima facie case and there is no genuine factual dispute on these claims.

### 2. Race, ethnicity, national origin, and sex discrimination under Title VII, Title IX, § 1981, and PHRA

#### a. Prima facie case

Dr. Nelatury alleges that he was discriminated against due to his race or ethnicity (Asian), national origin (Indian), and gender (male). Dkt. 38 at 22–24, 31, 38–40. Defendants argue that Dr. Nelatury cannot make out the four-pronged prima facie case of discrimination at the first step of *McDonnell-Douglas*. They are incorrect.

Dr. Nelatury undisputedly is (1) a member of protected classes: he is Asian, of Indian origin, and male. *See Burton*, 707 F.3d at 426; 42 U.S.C. § 2000e-2. He was (2) qualified, because the School of Engineering Director, Dr. Kurzweg, said "there could be an argument for

[his] promotion." Dkt.105-4 at 20. If an individual's "credentials for attainment of the rank of full professor [were] debatable," he met "the qualification prong of his required prima facie case." *Bennun*, 941 F.2d at 176. Dr. Nelatury (3) suffered an adverse employment action when he was not promoted. *Id.* And (4) those outside the protected classes, including female and non-Asian faculty, were promoted. *id.* There is, at minimum, a genuine dispute regarding the prima facie case of discrimination. Summary judgment is not appropriate on this basis.

### b. Pretext

At the second step of *McDonnell-Douglas*, Dr. Nelatury concedes Defendants had a legitimate, non-discriminatory reason for not promoting him: the weaknesses documented during the promotion reviews in 2018–19 and 2020–21. Dkt. 99 at 14. But he argues, at the third step of *McDonnell-Douglas*, that there is a genuine dispute of material fact about whether these weaknesses were in fact true or merely pretext for discrimination. *Id.* In support, Dr. Nelatury offers a repetitive jumble of theories and contentions, which the Court has carefully parsed and thoroughly reviewed.

*Research.* Dr. Nelatury argues that Defendants' concerns about the quality of his research were pretextual. He relies heavily on Dr. Kurzweg's observation that he was "possibly our most cited author." Dkt. 105-4 at 20. Dr. Nelatury also cites the number of his publications compared to other engineering faculty who were promoted. But quantity alone is not an appropriate metric by which to measure scholarly achievement. Dr. Kurzweg testified that Dr. Nelatury's research was superior to Dr. Wu's "[i]n quantity, yes. Quality, no." *Id.* at 41.

Dr. Nelatury ignores significant evidence that his research record did not warrant promotion. Only one external reviewer recommended promotion unreservedly. Dkt. 73-12 at 61. The other two noted that Dr. Nelatury's papers were "very brief and do not seem to consist of

original research or to carry scholarly value," covered a variety of topics without any theme, and were published in lesser-known and sometimes predatory journals. Dkt. 73-12 at 58, 63.[2]

The internal reviewers and committees made similar observations about Dr. Nelatury's journal and conference publications. Dkt. 73-16 at 67, 70–71, 73, 75. They concluded that Dr. Nelatury's other publications—textbooks and solution manuals—did not make a "significant contribution to the faculty member's field of expertise," per Penn State policy. *Id.* at 72.

***Teaching.*** Dr. Nelatury argues that Defendants' concerns about his teaching were pretextual. But during the 2018–19 promotion process, reviewers at various levels noted his inconsistent teaching performance: "there [was] no substantive improvement in the [SRTE] scores since the granting of tenure in 2009," with an average of "5.12 out of 7." Dkt. 73-16 at 66. And Dr. Nelatury's "scores in introductory classes—where students are still deciding their majors—were as low as 2.0 to 4.0 out of 7." *Id.* at 66, 70.

Dr. Nelatury contends that teaching introductory-level courses, where scores are often lower, brought down his overall SRTEs. It is true that Dr. Hemminger, another faculty member, said in a 2018 email that "we don't place much weight" on the SRTEs from a particular introductory course, EDSGN 100S, because scores "can be all over the place." Dkt. 88-5 at 8. But Dr. Kurzweg testified in his deposition that all SRTEs count and "[e]veryone should be able to teach all courses." Dkt. 91-10 at 33. In a different type of case, the tension between these statements might create a genuine factual issue. But, in the university context, there must be "more than a . . . disagreement about . . . the candidate's teaching abilities." *Molthan*, 778 F.2d at 962 (quoting *Zahorik*, 729 F.2d at 94). The reasons for the unfavorable assessments of Dr.

---

[2] A predatory journal is "typically a very low-quality journal that has very suspect peer reviews [and] typically a fixed price for publication with the promise of very quick turnaround in publications." Dkt. 91-10 at 48.

Nelatury's teaching are not so weak, implausible, inconsistent, or incoherent "that a reasonable factfinder could rationally find them unworthy of credence." *Atkinson*, 460 F.3d at 454.

*The presence of Dr. Diane Parente on two committees.* In Spring 2018, Parente sat on the ad hoc committee that reviewed Dr. Nelatury's promotion prospects. Dkt. 73-19 at 7. She was "hesitant to recommend someone who is strong in one area and has variability in teaching." Dkt. 88-5 at 7. Dr. Nelatury extrapolates she could therefore be relied on to oppose Dr. Nelatury's promotion when she served on the 2020–21 School Committee. Dkt. 73-19 at 15. But the committee decided to recommend that Dr. Nelatury go forward with the promotion process, calling his prospects "mixed – teaching is the big issue." Dkt. 88-5 at 3, 6. A reasonable jury could not conclude on this basis that Parente was biased against Dr. Nelatury.

*Excluded external review letter.* Dr. Nelatury argues that "the external review process was not fair and objective" because a positive external review letter was excluded from his dossier. Dkt. 98 at 39. As with many of his key assertions, he provides no record support—even though he bears the responsibility to point out the specific facts that raise a genuine dispute. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006). Be that as it may, over the course of many hours spent with the record, the Court deduced that the positive external review letter is likely Dkt. 94-3. This external review was positive but unhelpful. To take one example, when asked to identify major contributions Dr. Nelatury made and compare him to others in his field, the reviewer wrote, "I do not have the time to read the papers in this article and answer this question in a meaningful way!" Dkt. 94-3 at 1. Taking the letter into account would not have added any significant information to Dr. Nelatury's dossier.

*Chancellor Ford.* According to Dr. Nelatury, Chancellor Ford controlled all levels of the review process and was biased against him. Dr. Nelatury cites thirty-three emails. None,

however, show Ford controlling the process or colluding with anyone to predetermine its outcome. To the contrary, each email is an unexceptional exchange between administrators about things like Dr. Nelatury's petition to the FR & R Committee; how to implement the Committee's findings; what materials were permitted to be added to his dossier and how to add them; and the need to meet with Dr. Nelatury to explain that the School Committee and School Director did not support his promotion. *See, e.g.*, Dkt. 86-3, 86-7, 86-9, 86-10, 87-4, 88-7, 88-9, 88-18, 89-1, 89-2, 89-3, 89-11, 89-18, 90-1, 90-2.

Dr. Nelatury asserts that Dr. Ford's bias against him was evidenced by the fact that, "through threats and corrosion [sic]," Ford forced Dr. Nelatury to give up two years of credit toward tenure eligibility. Dkt. 99 at 2. While it is true that Dr. Nelatury lost two years of credit, Dkt. 99-5 at 1, there is no evidence that Dr. Ford accomplished this through threats. Dr. Nelatury attempts to provide support through his unsigned declaration. Dkt. 99-4. This attempt fails for two reasons. First, the Court cannot consider statements that are "both unsworn and not given under the penalty of perjury" when determining whether an issue of material fact exists. *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019). Second, while the Court considered many late-filed exhibits, the Court, as previously ordered, has not considered the batch that included the unsigned declaration (filed two days after the summary judgment opposition deadline). Dkt. 110. The signed version of the declaration was filed a full twenty-five days late, and the Court has not considered that either. *See* 117-1.[3]

---

[3] In any event, the declaration describes a conversation with Chancellor Ford that occurred in 2005, thirteen years before the events related to this lawsuit began. *See* Dkt. 117-1 at ¶¶ 28–37. And while the declaration describes Ford as showing "contempt toward [Dr. Nelatury's] experience and time working in India," *id.* at ¶ 33, Dr. Nelatury's deposition testimony about the same conversation recounted no such animus, Dkt. 91-1 at 15–16.

***Comparators.*** Dr. Nelatury argues he was treated less favorably than others outside his protected classes. The record shows, however, that the comparators, who were all promoted to full professor, had stronger dossiers than Dr. Nelatury did. To begin with, Dr. Chetan Nikhare is male, Asian, and Indian. Dkt. 74 at ¶¶ 9–10. He is the same sex, race, and national origin as Dr. Nelatury, but was promoted—which tends to hurt Dr. Nelatury's pretext argument. *See Simpson*, 142 F.3d at 646–47 (court considers comparators who both help and hurt plaintiff's case).

Turning to promoted faculty outside Dr. Nelatury's protected classes, Dr. Wu, an Asian female, had higher SRTEs and higher ratings by former students. *Compare* Dkt. 73-21 at 3–5 *with* Dkt. 73-16 at 19–20, 27. Most of "her publications [were] in top quartile journals and excellent conference venues." Dkt. 73-21 at 22. On service to the university, she was "chairperson of the largest major in the college . . . under difficult circumstances." *Id.* at 23. Dr. Zhou, an Asian male, had higher reviews from former students. Dkt. 73-23 at 3. An external reviewer called him "one of the lead researchers in the scientific community." *Id.* at 7. Dr. Rhodes, a female, had higher ratings by former students, served the university as Interim Associate Dean for Research and Graduate Studies, and received far more research grants than any other faculty member—nearly $6 million. Dkt. 73-22 at 3–4.

These faculty members' dossiers were stronger than Dr. Nelatury's in multiple ways. Therefore, their promotions would not permit a reasonable juror to find that Dr. Nelatury's lack of a promotion was discriminatory.

\*      \*      \*

Colleges and universities are the sole arbiters of promotion decisions "so long as the decisions are not made, in part large or small, upon statutorily impermissible reasons." *Franklin & Marshall.*, 775 F.2d at 117. Therefore, the only question before me is whether this record

would allow a reasonable jury to "find[] that . . . race [or national origin or sex] was a determinative factor" in deciding not to promote Dr. Nelatury. *Roebuck*, 852 F.2d at 731. It would not. Dr. Nelatury attempts to create a genuine issue of material fact, but his characterizations of the record are unsupported. There is simply a disagreement between Dr. Nelatury and Penn State "about the scholarly merits of [his] academic work, . . . [his] teaching abilities[,] or the academic needs" of Penn State Behrend. *Molthan*, 778 F.2d at 962 (quoting *Zahorik*, 729 F.2d at 94). That disagreement does not warrant a trial. *Id.*

## B. Retaliation claims

Dr. Nelatury claims he was not promoted in retaliation for complaining about discrimination. To state a prima facie claim for retaliation under Title VII, § 1981, Title IX, ADEA, or PHRA, a plaintiff must demonstrate that (1) he engaged in activity protected by the statute, (2) the employer took an adverse action against him either after or contemporaneously with the protected activity, and (3) there was a causal connection between the protected activity and the adverse action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017); *Castleberry*, 863 F.3d at 267.

The parties agree that (1) Dr. Nelatury's complaints to the FR&R Committee and the EEOC were protected activity and (2) not being promoted was an adverse action. The parties disagree on whether (3) there was a causal connection between the two. The causal connection must be but-for causation. *Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014). And there is no causal link if those who took the adverse action did not know of the protected activity. *Daniels*, 776 F.3d at 196.

Dr. Nelatury offers multiple theories to support a jury question on a causal connection. None of them creates a genuine factual issue warranting a trial.

***Adding material to the dossier.*** The FR&R Committee ruled that during the 2018–19 promotion process, Dr. Nelatury should have been permitted to add materials to his dossier that were dated up to February 15, 2019. Dr. Nelatury argues that during his 2020–21 re-review, administrators colluded to make sure he could not actually add anything to his dossier. That is incorrect. Dr. Nelatury added the following items to his 2020–21 dossier: a professional journal article; two books under contract; six chapters in textbooks; two academic journal articles; and one review. *Compare* Dkt. 73-12 at 30, 35, 36, 41–42 *with* Dkt. 73-16 at 31, 36–37, 41, 43.

In addition to these additions to the dossier itself, Dr. Nelatury was permitted to attach a supplemental folder with documents he wanted to include, but that Dr. Kurzweg, the director of the School of Engineering, did not think appropriate. Dkt. 89-1; Dkt. 89-12 at 3–7. Dr. Nelatury now attacks the supplemental folder as a deviation from the normal review process. However, the Administrative Guidelines for Promotion and Tenure provide that "[s]upplemental support materials" may be provided with the dossier. Dkt. 73-7 at 5.

***Chancellor Ford.*** Dr. Nelatury argues that Ford had his name scrubbed from the FR&R Committee report about unfairness in the 2018-19 promotion process. Dr. Nelatury cites an exhibit he calls "a copy of the investigation report,"[4] which says: "When [Dr. Nelatury] chose to move forward [with his 2018-19 promotion application] and requested that material be added to the supplemental file, the School Director [Kurzweg] consulted with the Dean [Ford] and Associate Dean for Academic Affairs who advised him that the request be denied." Dkt. 86-4.

---

[4] This exhibit has no title and indicates no author. Defendants argue it is double hearsay that Plaintiff would not be able to offer in admissible form at a trial. Defendants' Dkt. 133 at 11.

Vice Provost for Faculty Affairs Kathleen Bieschke sent a memo to the FR&R Committee saying Ford "had no recollection of being consulted by Dr. Kurzweg, and that his calendar and the email correspondence do not indicate that he was consulted about this situation." Dkt. 94-10.

Dr. Nelatury argues that Bieschke's memo "is a false statement designed to avoid liability for illegal conduct." Dkt. 99 at 22. It is not. On January 30, 2019, Kurzweg emailed Dr. Nelatury that he "received feedback from Glenhill" that Dr. Nelatury could not add materials to his dossier. Dkt. 73-13 at 2. By "Glenhill," he meant Associate Dean Silver, who "sat in the Glenhill administration building"—not Ford. Dkt. 76 at ¶ 10–11. This email chain was not forwarded to Ford until a year and a half later, on July 29, 2020. Dkt. 86-10 at 1. So a rational jury could not conclude that Ford's statement related in Bieschke's memo was false.

Plaintiff argues that Ford "denied all involvement in Dr. Nelatury's promotion." Dkt. 99 at 22. A rational jury could not conclude as much. The evidence shows that Ford denied involvement only with the decision about supplementing the 2018–19 dossier. Dkt. 94-10.

Plaintiff asserts that "Bieschke decided to remove Ford, at Ford's request, from an investigation where Ford was the primary person accused of illegal conduct." *Id.* A rational jury could not conclude as much. The faculty committee "completed its investigation" by June 2020, Dkt. 86-6; Bieschke asked that the record be corrected in October 2020. Dkt. 94-10. By that time, the investigation was over and Ford could not be "removed" from it.

Moreover, it is unclear how Dr. Nelatury's contentions, even if supported by the record, would show retaliation. Ford's correction of the record did not affect Dr. Nelatury at all, let alone adversely. Nor did it show causation. And although Ford disputed the FR&R Committee's factual finding, he and Bieschke did not ask for any change in the outcome of the investigation. To the

contrary, they expressed their belief that "this error does not change the decision to allow Dr. Nelatury to have his promotion dossier re-evaluated." Dkt. 94-10.

Plaintiff claims that Bieschke, Kurzweg, and Silver "all lied to maintain this completely false narrative Ford used to try and avoid liability for his illegal conduct." Plaintiff's Response to Statement of Facts 13; *see also* Dkt. 99 at 5 (Silver, Bieschke, and Kurzweg "accepted responsibility for Ford's conduct, they lied under oath, they disregarded their job responsibilities, they violated Penn [State] policies"). There is no evidence that anyone lied.

Dr. Nelatury's sweeping assertions about supposedly nefarious actions by Ford and other Behrend administrators are entirely baseless, as the Court's thorough review of Dr. Nelatury's unwieldy record reveals. They do not create a genuine issue of material fact.

\*     \*     \*

In sum, none of Dr. Nelatury's arguments raise a genuine factual issue about the required third element of his prima facie case: a causal connection between the protected activity and the adverse action. Aside from that, the School Committees expressed the same concerns about Dr. Nelatury's teaching and research before and after his discrimination complaint—and we have held that a causal link is difficult to establish where a plaintiff "received significant negative evaluations before engaging in the protected activity." *Ross*, 755 F.3d at 194. Finally, Dr. Nelatury points to no evidence that the members of the School Committee knew about his protected activity, so there can be no plausible causal connection. *See Daniels*, 776 F.3d at 196. Defendants are therefore entitled to summary judgment on the retaliation claims.

## C.    First Amendment claim

Dr. Nelatury alleges his First Amendment rights were violated because Defendants withheld promotion in retaliation for his decision to publish his scholarship in open access

journals rather than traditional ones. To prevail on this 42 U.S.C. § 1983 claim, Dr. Nelatury must show that Defendants, acting under color of law, violated his First Amendment rights and caused him injury. *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

Dr. Nelatury does not claim retaliation based on what he wrote in his publications, but instead based on his decision to publish in open-access journals. Expressive conduct like this can be protected under the First Amendment, just as speech is, if the actor "inten[ded] to convey a particularized message" and "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The plaintiff must show that the conduct "was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). Defendants may then "escape liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Bd. of Cnty. Comm'rs. v. Umbehr*, 518 U.S. 668, 675 (1996).

Defendants argue that Dr. Nelatury's conduct of publishing in open-access journals was not expressive; that open-access publishing was not a substantial factor in the alleged retaliation because it is not why he was denied promotion; and that they would have made the same decision regardless of Dr. Nelatury's publishing venues. They also suggest that Dr. Nelatury has conceded his First Amendment claims. Dkt. 133 at 7–8. Defendants are correct that Dr. Nelatury does not mention the First Amendment claim in his summary judgment opposition papers. However, this does not mean Defendants win. "An unopposed summary-judgment motion is not tantamount to a default judgment, because the court still must find for itself that there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law." *United States v. Brace*, 1 F.4th 137, 143 (3d Cir. 2021). Upon a thorough review of the record, the Court finds for itself that Defendants deserve judgment as a matter of law.

Dr. Nelatury failed to point to any evidence showing that he published in open-access journals to convey a message. Dr. Nelatury's co-authors often made the decision, and whether they did or he did, the open-access nature of a journal was immaterial to their choice. Dkt. 73-1 at 30–34; Dkt. 91-1 at 116–20. Therefore, Dr. Nelatury did not intend his publication decisions to "convey a particularized message"—which means they were not expressive conduct and were not protected by the First Amendment. *Johnson*, 491 U.S. at 404.

Additionally, Dr. Nelatury's open-access publishing was not a substantial factor in the claimed retaliation because it is not why he was denied promotion, and Defendants would have made the same promotion decision regardless. Ford noted in his review of Dr. Nelatury's dossier that "there are some very high impact open access journals," but Dr. Nelatury was publishing in lower-quality ones, some of which had been identified as "predatory." Dkt. 73-16 at 71. The problem was not open-access publishing, but the questionable quality of Dr. Nelatury's scholarship, which multiple reviewers commented on. *See, e.g.*, Dkt. 73-12 at 58–59.

For these reasons, there is no genuine issue of fact regarding First Amendment retaliation and Defendants are entitled to summary judgment.

## D.    Breach of contract claims

Finally, Dr. Nelatury claims that the "Penn State policies create a contractual right," and that "Defendants admitted to the breach and then the people who were supposed to provide the correct action colluded with the breaching parties to subject Plaintiff to an even worse breach." Dkt. 99 at 14. To succeed on a breach of contract claim, a plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010) (internal citation and quotation marks omitted).

Defendants argue that, assuming a contract exists, there is no evidence of breach. In his response, Dr. Nelatury makes only two passing references to breach of contract. *See* Dkt. 99 at 14, 24. Despite the lack of effective opposition, Defendants do not automatically win summary judgment. *Brace*, 1 F.4th at 143. The Court's review of the record, though, shows "no genuine dispute of material fact"—so Defendants "deserve[] judgment as a matter of law." *Id.*

First, Dr. Nelatury alleges that he was not given the opportunity to pre-approve the composition of the ad hoc committee evaluating his 2018–19 candidacy for promotion. Dr. Nelatury has not pointed to any provision of Defendants' policies providing that a faculty member approves the composition of the ad hoc committee. The FR&R Committee "found no evidence of procedural errors in the creation of the first level promotion to professor committee" in 2018–19. Dkt. 73-14 at 2.

Second, Dr. Nelatury alleges that he was not permitted to add materials to his dossier in the 2018–19 promotion cycle. Penn State policies permit candidates for promotion or tenure to supplement their dossiers up to a certain date. For the 2018–19 cycle, that date was February 15, 2019. While Dr. Nelatury is correct that initially, he was wrongfully barred from adding to his dossier, this error was remedied. After he filed a complaint with the FR&R Committee, he was permitted to supplement his dossier, and it was re-reviewed in the 2020–21 cycle.

Finally, Dr. Nelatury alleges that he was not informed that student evaluations of his teaching would be considered throughout his promotion process, and he was not provided with mentorship around improving his teaching. However, this argument fails because Dr. Nelatury, as a member of promotion and tenure review committees, knew that teaching evaluations were considered. Dkt. 73-1 at 13, 15–16. In addition, Dr. Nelatury demonstrated this knowledge in an

email to Ford in 2015. Discussing his own chances for promotion, Dr. Nelatury stated he had

been told "that my SRTEs must be stabilized." Dkt. 73-8.

Assuming a contract existed, no reasonable juror could find that it was violated.

Defendants are therefore entitled to summary judgment on the contract claim.

## V.    Motion to Strike

A plaintiff's responsive concise statement of material facts must "respond[] to each

numbered paragraph in the moving party's Concise Statement" by admitting or denying each

one, setting forth the basis for any denials, and "setting forth in separately numbered paragraphs

any other material facts that are allegedly at issue." LCvR 56(C)(1). "The purpose of [LCvR 56]

is to aid the court in deciding a motion for summary judgment by identifying material facts and

supporting documentation to determine whether or not the fact is disputed." *Bouriez v. Carnegie*

*Mellon Univ.*, No. 02-2104, 2005 WL 2106582, at *3 (W.D. Pa. Aug. 26, 2005). That purpose

was not served by Dr. Nelatury's counterstatement, which provided additional facts that were not

listed in separately numbered paragraphs, *POM of Pa., LLC v. Pa. Skill Games, LLC*, No. 18-

722, 2021 WL 1788405, at *2 (W.D. Pa. May 5, 2021); included legal argument, *DOCA Co. v.*

*Westinghouse Elec. Co., LLC*, No. 04-1951, 2012 WL 5877490, at *1 (W.D. Pa. Nov. 20, 2012);

and engaged in unsupported *ad hominem* attacks, *Lewis v. Delp Fam. Powder Coatings, Inc.*, No.

08-1365, 2010 WL 3672240, at *4 (W.D. Pa. Sept. 15, 2010). Defendants filed a motion to strike

these improper portions of the counterstatement, Dkt. 114, which was not timely opposed.

The Court "has the authority to strike filings that fail to comply with its local rules."

*Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 614 (3d Cir. 2018). Nevertheless, the Court held

the motion to strike in abeyance. Dkt. 123. As anticipated, ruling on the summary judgment

motion has required sorting out "which properly supported facts [were] essential to the motion."

*DOCA*, 2012 WL 5877490, at *1. In reaching the summary judgment ruling explained above, the

Court "treat[ed] legal argument contained in [the] statement of fact as if set forth in [Dr. Nelatury's] brief." *Id.* The Court considered the additional facts that should have been set forth in separately numbered paragraphs, but were not. *See Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 286 (W.D. Pa. 2020) (explaining that, "[f]or the sake of efficiency, the Court [would] . . . address any additional facts asserted by Plaintiff that arguably raise[d] material factual issues" without noting each time it did so). After confirming that the personal attacks were unsupported, the Court ignored them.

While the Court credits, and indeed shares, Defendants' views on these rule violations, the Court has consistently conducted this case so as to reach the merits to greatest extent possible and not allow Dr. Nelatury's cause to be harmed by his counsel's deficiencies. *See, e.g.*, Dkt. 110, 130. As it turns out, the undisputed rule violations of Dr. Nelatury's Counterstatement did not ultimately prejudice Defendants: they have won summary judgment.[5] Defendants' Motion to Strike will therefore be denied as moot.

## VI.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. 70) will be granted in full, and summary judgment is entered in Defendants' favor and against Plaintiff as to all claims. Defendants' Motion to Strike (Dkt. 114) will be denied as moot.

DATED: January 16, 2025

_____
D. MICHAEL FISHER
UNITED STATES CIRCUIT JUDGE

---

[5] To be sure, Plaintiff's counsel's violations have burdened Defendants, just as they have burdened the Court, and have increased the cost and complexity of this litigation.